[Civ. No. 5083. Fourth Dist. Nov. 30, 1955.]

ALEX FOODS, INC., Respondent, v. BILL WOODSON METCALFE et al., Appellants.

Albert Lee Stephens, Jr., and Mize, Kroese, Larsh & Mize for Appellants.

Stephen F. Gallagher for Respondent.

GRIFFIN, J—Originally, on May 7, 1954, plaintiff and respondent brought this injunction proceeding against defendant and appellant Bill W. Metcalfe, a former employee

of plaintiff, and obtained a temporary order restraining him from competing with plaintiff company in the capacity of driver salesman in the sale of Spanish foods, salads, etc. Later, on May 19, 1954, by amendment to the complaint joining defendant and appellant Lloyd Torgerson, an independent dealer in such goods, and who employed Metcalfe as a driver salesman, Torgerson was, together with Metcalfe, restrained accordingly. Appeals were taken from these respective orders out of an abundance of precaution and fear that plaintiff might believe these temporary restraining orders were still effective, since they were somewhat broader in terms than the preliminary injunctive order subsequently issued. Later, after a hearing of the injunction matter, the court, by minute order entered May 22, 1954, granted a preliminary injunction against both defendants and a formal written order was signed on May 28, 1954, setting forth in detail the specific provisions of the injunction.

Without determining whether the temporary restraining orders are or were effective we will, for the purpose of deciding the real issues here involved, conclude that the temporary orders, if they did continue in existence without a special order dissolving them, were merged with the subsequent formal written order granting the preliminary injunction on May 28, 1954. (*Knight* v. *Cohen,* 5 Cal.App. 296 [90 P. 145] ; 14 Cal.Jur. p. 186, § 11.)

Plaintiff Alex Foods, Inc. (hereinafter referred to as Alex) manufactures perishable Spanish food products, and sells and distributes them throughout Southern California. Its principal place of business and plant are in Orange County. Its principal competitor in that district is XLNT Spanish Food Company (hereinafter referred to as XLNT), a Spanish food products company. Eight additional concerns with sizeable businesses compete with the named companies in the manufacture, sale, and distribution of such Spanish food products. Alex and XLNT manufacture and distribute Spanish foods of the same general nature and character, although XLNT does, and Alex does not, manufacture a line of canned goods in addition to its other Spanish food products. Alex distributes a certain cheese line and fish line which XLNT does not distribute.

Defendant and appellant Torgerson is a wholesale food distributor specializing in XLNT Spanish Food products. He has sold them since 1929. When this action was commenced he was selling and distributing in Los Angeles County

and parts of Orange County pursuant to an agreement with XLNT which allocated the territory to him and fixed its boundaries. At the time this action was filed Torgerson had set up five routes in the territory assigned to him, and these were served by three trucks, each of which worked a different route every day. Three of these routes were in Orange County and had a total of 75 customers.

Defendant Metcalfe is a salesman by occupation. For approximately six years prior to the hearing of this cause he had been a salesman of Spanish foods. From 1946 to 1948, he worked as delicatessen manager for another company and as such he became familiar with many elements of the delicatessen business, including the method of sale and character of food products sold in delicatessen stores including Spanish-American foods. During this time he purchased and merchandised the products of XLNT, Alex, and Superior Food Products Company. In 1948, he accepted employment as a route salesman for one Rothaermel, who was then a distributor of Spanish food products for Alex. He was then assigned a definite route in Rothaermel's territory around Pomona, and was issued a small list of markets and cafés within the area of his route and told to build up the route by calling on all the additional markets and cafés in that area. He remained on that route for about a year. In June of 1949, he was assigned a route in Orange County, and while working this route he serviced with Spanish foods some markets and stores who were customers of Alex when this action was commenced. Sometime in 1950, Rothaermel's distributorship was terminated and he "merged" with Alex. Meanwhile, Metcalfe continued to work for Rothaermel on the Orange County route until the "merger" with Alex and was promoted to supervisor, continuing in that capacity for Alex after the merger until leaving their employ in 1954. Metcalfe's duties as supervisor for Alex included developing routes in new areas, serving as relief route driver when regular drivers went on vacation and at other times when relief was necessary, breaking in new men as route drivers, serving as liaison between the front office and the route drivers, and going along with the regular route drivers in order to smooth over any trouble which had developed at any stop on his route. When Metcalfe relieved a regular driver for Alex, he was given the driver's route list and served the stops thereon. He made no effort on such occasions to acquire new customers. The route lists contained the names and addresses

of the customers, what they normally bought and the dates they were called upon. In developing new routes for Alex, Metcalfe was assigned a few stops from an existing route and a new area, and he was instructed to call on every market and café in that area. He was left to his own discretion in this pursuit and received no particular instructions from Alex, although Alex did furnish him with an appropriate price list of its products. After acquiring a sufficient number of stops in the new area, Metcalfe would turn the route over to a new driver and repeat the process in another area. In performing the duties of a supervisor and relief route man, Metcalfe operated in the counties of Orange, San Bernardino, San Diego, Riverside, Los Angeles, Ventura and Santa Barbara. As a consequence he became acquainted with the various routes established and operated by Alex in those counties. While Metcalfe was employed by Alex, the company prepared an addressograph system covering the customers on its various routes. Individual route salesmen submitted lists of customers from their routes and the addressograph lists and plates were taken from these salesmen's lists. Metcalfe assisted in the preparation of the lists and plates covering Orange and San Diego Counties. In addition to assisting with the addressograph system, Metcalfe also helped manage routes for Alex. Metcalfe testified he did not keep any of the route books nor any records or memoranda of any information he acquired, when he left Alex. He testified that although he helped prepare these lists, he took none of them with him and did not need such lists because he could well remember the customers' names and places of business and the information contained thereon, without the use of them. As a result of his experience with Alex, Metcalfe became acquainted with the price of products, discount policy for quantity purchases, the type of its products, and difficulties encountered with respect to their perishability.

Toward the end of Metcalfe's employment by Alex, differences arose between Metcalfe and Alex's salesmanager over certain matters and between Metcalfe and the company over his future status and duties. On March 20, 1954, Metcalfe wrote Alex a letter in which he stated that on Friday night, March 19th, he was informed that he had been relieved of his duties as supervisor by Rothaermel and that he wished to arrange a meeting with the company to present his side of the story and review any charges that may have been made against him. Apparently, as a consequence, on April 15th,

Metcalfe gave the company two weeks' notice of his intention to quit, and on the following day Alex terminated his employment.

It appears from Metcalfe's testimony that on April 17th, Metcalfe telephoned defendant Torgerson and told him that he was no longer working for Alex and was looking for a job; that later that afternoon he met Torgerson at his place of business and Torgerson told him that he was reorganizing certain routes in Orange County for the purpose of covering that area more intensively, and they discussed the possibility of Metcalfe's employment to assist in this work, but that no understanding was then reached.

Torgerson testified that such reorganization was necessary because his driver who handled the Orange County route had diabetes and had to work closer to his home. Metcalfe further testified that during the next few days he had several telephone conversations with Torgerson concerning his employment and that on April 21, he saw Torgerson in person and he offered Metcalfe employment as route salesman and to assist in the reorganization of the Orange County routes, and that he then went to work on April 23d for Mr. Torgerson. He further testified that in the discussions leading to his employment by Torgerson no mention was made of any information acquired by Metcalfe while in Alex's employment concerning its customers, their names and addresses, and which ones were or were not profitable, its routes, route lists, price and credit policies or any aspect of its business; and none was made thereafter prior to the filing of the complaint herein; that he never offered to show, produce or hand over to Torgerson any route books or lists of customers or other information which he used while with Alex; and that Torgerson never requested such information from him.

It appears that for a number of days after his employment by Torgerson, Metcalfe rode with Torgerson and one of his drivers on several of Torgerson's routes in Orange and Los Angeles Counties. Metcalfe was assigned several routes in an area in Orange County which had formerly been serviced by one Atkinson, one of Torgerson's regular drivers. He was given a route list which Atkinson had used and a price list, and was instructed to arrange his own schedule in the area and to call on all businesses in the area which might sell XLNT merchandise such as markets, restaurants, schools and delicatessens, and he was left largely to his own discretion in developing the routes to their maximum capacity.

Metcalfe claimed that when he left Alex's employment he bore no ill will toward the company or his superiors there and his feelings toward them were friendly; and that in seeking new customers for Torgerson, while working on the Orange County territory, he did not seek in any manner to disparage the products of Alex or persuade markets or stores to stop purchasing its products and substitute those of XLNT.

Torgerson testified that he assigned Metcalfe to the routes in Orange County in order to achieve more economical operation of routes; that ordinarily, his route men loaded their trucks with merchandise each morning at his place of business before starting on their daily routes; that when they completed their routes they returned to Torgerson's to check in. Metcalfe worked for Torgerson on the routes in Orange County from May 3d to May 7th, and during this period he obtained 35 new customers for him. When Metcalfe took over this territory all of these customers (some preferred) were handling Alex products, and none of them was handling XLNT products. Metcalfe had had business dealings with 33 of these 35 customers when he worked for Alex. But with the exception of four customers in Costa Mesa, all of these dealings had occurred more than six months prior to the time he commenced working for Torgerson. There is some evidence that a few did, but there is no evidence that the remainder of these customers quit the Alex products and substituted XLNT products. The evidence is that the great majority of them continued to sell both of these products along with other competing products.

On May 7, 1954, Torgerson dismissed Metcalfe because of the filing of this action and the issuance of a temporary restraining order against him, because Torgerson did not want to become involved in any trouble with Alex. Torgerson immediately took over the routes, including the customers obtained by Metcalfe, and when Torgerson was served with a temporary restraining order, these routes were turned over to the officers and employees of XLNT, under some arrangements with them. Apparently, Metcalfe was subsequently employed by XLNT in some other capacity. Included among the customers of plaintiff were a few restaurants, as well as cafeterias and grocery stores, but they were principally large volume food markets, and over 50 per cent of them handled a competing line of Spanish foods. There were a few stores, restaurants, and cafeterias (the number of them is not clear from the record) to which plaintiff formerly sold

some of its products, which quit patronizing plaintiff, either in part or in whole, and started patronizing defendants. Defendants offered in evidence a route list of retail grocery stores in Orange County put out by the local newspaper. It showed the name of the store, address, name of manager or owner, rating, and buying connection. Similar route lists for neighboring counties were in evidence. These route lists were available to any salesman representing regional or nationally advertised products. The names of most of the customers to which plaintiff and defendants sold their goods were contained therein, excepting a restaurant or two and delicatessen stores which handled orders of chili con carne, salads, etc.

After hearing, the trial court adjudged and decreed, until further order of the court, that defendants be enjoined and restrained from, directly or indirectly (a) Seeking out or soliciting any of the customers of plaintiff or any routes of plaintiff for the purpose of selling, or offering to sell, to any of said customers, any of the food products hereinafter described, by or through the use of any confidential information of plaintiff secured by defendant Metcalfe during and in the course of his employment by plaintiff for any portion of the period of approximately six years ending on April 22, 1954. The food varieties mentioned are Spanish foods and other foods customarily sold in delicatessen stores and sold or distributed by either plaintiff or defendants in the counties of Orange or Los Angeles. The routes referred to are those developed by plaintiff for the sale and distribution of said food products within those counties which came to the knowledge of the defendant Metcalfe, during and in the course of his employment by plaintiff; (b) Seeking out or soliciting any of said customers of plaintiff with which defendant Metcalfe personally transacted business for or on behalf of plaintiff during the period of his employment by plaintiff for the purpose of selling or offering to sell any of said food products to any of said customers; (c) Selling or delivering any of said food products to (certain of plaintiff's customers hereinafter designated) who, since the employment of defendant Metcalfe by defendant Torgerson, have been solicited by defendant Metcalfe for the sale of any of said food products; provided that certain customers of plaintiff are those whose identity has been secured by defendant Metcalfe, from confidential information concerning the routes or customers of plaintiff while in the employment of plaintiff,

and who were not customers of defendant Torgerson prior to the employment of Metcalfe by Torgerson; (d) Making use of any of the confidential information consisting of the names and addresses of plaintiff's customers, the types of said food products sold to plaintiff's customers, and the volume and price thereof, and their particular needs in connection with said food products, including also any commercial use of the friendly feeling secured or developed by defendant Metcalfe during and in the course of his employment by plaintiff. A writ of injunction was issued accordingly.

Defendants' claim is that the complaint does not state a cause of action, and that the evidence is not sufficient to support such an injunction. In this respect defendants rely principally upon the decisions in *Aetna Bldg. Maintenance Co.* v. *West*, 39 Cal.2d 198 [246 P.2d 11]; and *Avocado Sales Co.* v. *Wyse*, 122 Cal.App. 627 [10 P.2d 485]. They claim that proof of the five elements which are stated therein to be a prerequisite to the issuance of such injunction were lacking, and it should be denied because (1) There was no confidential information not readily accessible to competitors; (2) The former employee did not solicit the customers of the former employer with intent to injure; (3) There were no preferred customers whose trade was particularly profitable and whose identities were not generally known to the trade which were sought out by the former employee: (4) The business is not such that a customer will ordinarily patronize only one concern; and (5) The business relationship between the customer and the former employee would not normally continue unless interfered with because it depends on the quality of the product and the efficiency of the service.

It is further contended that no injunction should issue against defendant Torgerson in any event and that the restraints imposed are too broad in that they restrain defendants from the solicitation of and the sale to customers of plaintiff of products produced and distributed by defendants, or either of them, even though said products were not produced or distributed by plaintiff.

Section 2860 of the Labor Code provides that everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment. ■ A customer list built up by the

employer over a period of years is his property, and its use by a former employee for his own advantage will be enjoined. (*California Intelligence Bureau* v. *Cunningham*, 83 Cal.App. 2d 197 [188 P.2d 303].) ■ Equity will intervene to restrain an employee from divulging confidential information gained in the course of his employment or using such information to his employer's prejudice. ■ On the other hand, every individual possesses a form of property, the right to pursue any calling, business or profession he may choose. ■ A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. ■ Equity will, to the fullest extent, protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. (*Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104 [148 P.2d 9].)

The main question here presented is whether, under the facts of the instant case, defendants come within this latter class, are entitled to such protection, and were not guilty of unfair competition in soliciting the customers of plaintiff.

The next question is whether the facts bring defendants within the principles set forth in the line of cases exemplified by *George* v. *Burdusis*, 21 Cal.2d 153 [130 P.2d 399]; *Empire Steam Laundry* v. *Lozier*, 165 Cal. 95 [130 P. 1180, Ann.Cas. 1914C 628, 44 L.R.A.N.S. 1159], and other cases cited in *California Intelligence Bureau* v. *Cunningham*, 83 Cal.App.2d 197, at 202 [188 P.2d 303] pertaining to the so-called "route cases," or whether the facts bring the case within the line of decisions illustrated by *Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104 [148 P.2d 9]; *Avocado Sales Co.* v. *Wyse, supra,* and similar cases cited in *California Intelligence Bureau* v. *Cunningham, supra,* page 202. The elements necessary to be shown in the first class of cases are indicated therein. *Aetna Bldg. Maintenance Co.* v. *West,* 39 Cal.2d 198 [246 P.2d 11], readopts the statement that proof of these elements is necessary to justify the application of the principles giving rights of parties in connection with *retail* delivery routes, and lists them as follows:

". . . to obtain relief against a former employee it must be shown: (1) The information was confidential and not readily accessible to competitors; (2) The former employee solicited the customers of his former employer with intent to injure him; (3) The former employee sought out certain preferred customers whose trade is particularly profitable and whose identities are not generally known to the trade; (4) The business is such that a customer will ordinarily patronize only one concern; (5) The established business relationship between the customer and the former employer would normally continue unless interfered with."

Assuming that some of the facts here related might bring defendants within the principles applicable to the so-called route cases, the evidence produced in this respect, although capable of being otherwise interpreted, might be sufficient to support the trial court's conclusion as to element No. 1 above mentioned in the Aetna case that defendant Metcalfe did have knowledge and confidential information of the routes, route sheets, the types of food products sold to plaintiff's customers, the volume price, the particular needs of the customers which were not readily accessible to competitors, and had a friendly feeling secured or developed by defendant Metcalfe for said customers during and in the course of his employment by plaintiff. ▆ It is not necessary to show that the employee actually used such lists if he carried such lists in his mind or memory. (*George* v. *Burdusis, supra.*) As to the second element, that he solicited the customers of plaintiff with intent to injure plaintiff might be reasonably inferred from the evidence. As to the third, that he sought out certain preferred customers whose trade was particularly profitable and whose identities were not generally known to the trade may have been established. As to No. 4, it is clear that the requirement that the business be such that a customer will ordinarily patronize one concern is not established as to most of the customers in dispute. In fact the evidence shows that the great portion of these customers were food markets carrying competitive lines, and that they do not ordinarily patronize only one concern. As to the fifth element, although proof of a contrary finding might be supported, it does appear that plaintiff's business with only a few of these customers would have necessarily continued unless interfered with. Some distinction between *retail* delivery route cases and *wholesale* buyers is apparently made. (*George* v. *Burdusis, supra,* p. 159.) Here, the plaintiff was

a wholesaler and a great majority of the customers were wholesale buyers handling competing lines, and continued to handle plaintiff's line of goods.

As indicated in the West case and *California Intelligence Bureau* v. *Cunningham, supra,* the required elements related read in the conjunctive and not in the alternative. The question arises as to whether or not all of these elements must concur before injunction could properly issue in a so-called route case. (See interesting discussion on ''Unfair Competition,'' in 41 Cal.L.Rev. p. 38.) If all of these elements must concur then plaintiff's injunction must fall as to those customers which do not qualify thereunder because of lack of proof of all of such elements.

In *California Intelligence Bureau* v. *Cunningham, supra,* p. 202, a second group of cases is cited holding that equity will not enjoin a former employee from using knowledge or information gained while in the employ of a former employer if:

''. . . (1) the customers solicited (a) do not constitute a trade secret, or confidential information, or a confidential list in which a proprietary interest might be claimed, or (b) are commonly known to the trade and are called upon by salesmen for various companies, or are *wholesale* buyers whose names appear in directories and are so few in number that anyone might readily discover them, and the list of them is not secret or confidential; (2) the former employer is in open competition with others engaged in similar business, selling in an open, competitive market; (3) the former employee was a salesman of his former employer in a commercial field where there was no assurance of an order unless he could satisfy his customer that his product was better, cheaper, or more salable than that of his competitor, where the customer usually desired to examine, inspect and compare the product and prices offered to him and each sale was a distinct transaction, not necessarily implying that another will follow; (4) no secret or trust reposed in the former employee in the course of his employment is violated and no trade or business secret or confidential information is used by the former employee.'' (Italics ours.)

Regardless of the classification into which the facts herein mentioned bring this case, it is clear that if the continuance of an employer's trade depends on keeping secret the names of customers or other valuable information known to such employer, his employee, having gained knowledge of

such secrets in the course of his employment, cannot thereafter utilize such knowledge to the prejudice of his former employer. Independent of an express contract, equity will enjoin the disclosure of confidential knowledge of trade secrets which a former employee learned in the course of his employment. The fact that a defendant was employed by plaintiff for years during which he learned the names, addresses, and requirements of plaintiff's customers justifies injunctive relief where the defendant undertook to use such information in unfair competition to the detriment of plaintiff. Such knowledge is a part of the good will of the business and is a trade secret. A list of customers is a trade secret if there is confidential information as to such customers. To act upon it is an improper use of confidential information and amounts to unfair competition. " '. . . the additional influence of the friendly contact of the former employee with the persons whose business he would carry to his new connection brings the solicitation within the condemnation of unfair competition.' " (*Wallich* v. *Koren*, 80 Cal.App.2d 223, 226 [181 P.2d 682]; *Dairy Dale Co.* v. *Azevedo*, 211 Cal. 344 [295 P. 10].) Equitable protection may be invoked against the subsequent use by a former employee of knowledge of the "peculiar likes and fancies and other characteristics" of the former employer's customers where such knowledge will aid him in securing and retaining their business. This rule applies generally to trade route cases as well as others involving a knowledge of the customers desired for specialized information, their preferences for certain products, and their buying habits. (*Aetna Bldg. Maintenance Co.* v. *West*, *supra*, p. 205.)

The trial court was justified in believing that as to a small number of the 33 customers the necessary elements had been established to warrant the conclusion that injunction should be issued against defendants precluding them from soliciting and selling to certain restaurants, delicatessen stores, etc., who as customers of plaintiff had been solicited by Metcalfe, and who quit taking plaintiff's products because of such solicitation, and to whom he was then selling his competitor's products. But this is not true as to those wholesale buyers, dealing in competitive lines, and who continued to remain customers of plaintiff, even though a portion of their business may have been solicited by defendants.

As to these wholesale buyers of Spanish food products, it

is shown that almost every one carries more than one brand of such food products; that it is the present marketing custom, and firmly established, that every such market must furnish as wide a selection of named brand products as possible so that the consumer will be able to select any brand such consumer may particularly desire among food products of similar type. In this respect the sale and distribution of food products to retail markets, as wholesalers, bears no resemblance to the sale of ice, laundry service, or janitorial service, because items such as these are items which are not duplicated by one customer and therefore the sale of such items to a customer already using such an item from one source means displacement from that source to be supplanted by the new item sold. In the case of food products, the sale of an additional food product is not a displacement item as the sale of both products can continue at the same time and the proportion of sales of each product would be wholly dependent upon the quality and price and other factors of marketing ability which are strictly a matter of free and open competition. The customer's place of business is open to the public and is advertised by every medium at their command. Their existence is not a secret of any kind. They are classified in telephone directories and in booklets published by newspapers interested in encouraging business, and they provide plans and routes to serve grocery stores and markets according to their most economical operation.

The general rule is stated in the Aetna case to be that merely informing customers of one's former employer of change of employment without more, is not solicitation, and that equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. The order here involved does not indicate and (since the exhibit from which the witnesses were testifying was not brought up) the record does not show in detail which of the 33 customers may have quit taking plaintiff's products and took defendant's products as a result of defendant's solicitation. The testimony is that a great majority who carried plaintiff's line of food products also carried XLNT products. It does not show in particular which of these customers took XLNT products as a result of wrongful or unfair solicitation on the part of Metcalfe, or whether these customers voluntarily added the competing line

without wrongful or unfair solicitation. It is clear that in the latter case defendants could not be enjoined from accepting this business and making sales thereafter to such customers. (*Golden State Milk Products Co.* v. *Brown*, 217 Cal. 570 [20 P.2d 657].)

It was held in the Aetna case that where the employee informed his former employer's customers that he was terminating his services and of his plans to go into competing business himself, that was not unfair solicitation since there was no suggestion that the customer cancel its contract with the former employer.

In *Continental Car-Na-Var Corp.* v. *Moseley, supra,* the employee sent out letters to certain customers of his former employer advising them of his severance of business relations with the former employer and that he was engaging in business for himself. This was held not to be unfair solicitation. (See also *Theodore* v. *Williams*, 44 Cal.App. 34, 37 [185 P. 1014].)

Although Metcalfe testified he solicited most of these customers to also buy XLNT products none of plaintiff's customers ever testified that defendant unfairly solicited, in any manner, any of the business they turned over to defendants, and there was no evidence that defendants ever spoke disparagingly of plaintiff's food products, or that any of plaintiff's customers quit taking its products because of such unfair solicitation. Accordingly, the injunction should only restrain defendants from soliciting or selling or delivering to the class of customers indicated who may have been wrongfully or unfairly solicited by Metcalfe, during the period in question. The injunction extended only to Orange and Los Angeles counties, as indicated by the order, and not to other neighboring counties, as contended by defendants. The injunction was too broad in its terms if it was intended thereby to restrain defendants from selling its products not handled by plaintiff.

 It is established that the injunction to this extent may also run against defendant's new employer as well. (*George* v. *Burdusis, supra*; *Santa Monica Ice & Cold Storage Co.* v. *Rossier*, 42 Cal.App.2d 467 [109 P.2d 382].) In the absence of a specific finding, the question as to which particular customers may have been so wrongfully and unfairly solicited would become a factual question to be determined upon any possible contempt proceedings.

Order granting preliminary injunction should be and is modified accordingly and affirmed as thus modified.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied December 21, 1955, and appellants' petition for a hearing by the Supreme Court was denied January 25, 1956.