[Civ. No. 22366.   Second Dist., Div. Two.   Nov. 18, 1957.]

FREDRIC REID et al. (a Partnership), Respondents, v. THE MASS COMPANY, INC. (a Corporation), et al., Appellants.

Budd W. MacDonald for Appellants.

Charles Hollopeter for Respondents.

FOX, Acting P. J.—Plaintiffs brought this suit for damages and an injunction against a corporation and several individual defendants. The lower court rendered judgment awarding plaintiffs $3,500 and enjoining defendants "from soliciting any advertisements or advertising services from any customers of plaintiffs with whom they became acquainted or whose identity or addresses they learned while in and by virtue of, or in the course of, their employment or other official capacity with plaintiffs." Defendants have appealed.

Plaintiffs publish and distribute throughout California and neighboring states an advertising medium for merchants in the form of a green alphabetically indexed book entitled "Names 'N Places." Ostensibly the book is a telephone directory in which the user may keep names, addresses and telephone numbers; however, it also contains a directory of

subscribing merchants in the particular community. In addition there is display advertising of said merchants and detachable gift certificates or other sales inducements. The service is distributed to each new householder who moves into the community, and a copy is also given to each merchant who subscribes to the service. No other persons receive a copy of the booklet. Plaintiffs' advertisers were given plastic decals indicating they were Names 'N Places subscribers; many subscribers display these in their store windows. The obvious purpose of the service is to induce new householders to frequent the places of business of the subscribing merchants.

In the operation of plaintiffs' business there is a contract with each merchant that participates in their program. The contract provides that the merchant shall pay a sum of money computed upon the number of books that are distributed to the householders, and the usual rate is 15 cents per book. Although the contracts do not provide for an expiration date, the service is usually completed within one year or a year and a half. Each merchant's contract would begin and end at the same time as other merchant subscribers in the same community. This was not true with respect to other similar types of services.

Since 1950 the plaintiffs' practice with respect to renewals has been to send their salesmen into a community approximately a month or six weeks before the anticipated completion of the present service in order to renew as many of the accounts as possible. Some 50 per cent to 70 per cent of the advertisers renew their contracts. This early return to a community was also necessary in order that plaintiffs would have sufficient time to print their next publication. Plaintiffs'. service was a continuous operation and hence it was not desirable that any time should be lost between publications during which houses would be built and sold.

In order to determine in advance the anticipated expiration date in each community, it was necessary to make reference to a "master chart" prepared by plaintiffs' office manager. Only a few persons in plaintiffs' organization had access to this chart and similar charts for prior years. One of these persons was defendant Snetsinger. He was plaintiffs' sales manager until his employment was terminated in April, 1955. At that time he had in his possession a copy of the master chart and admittedly used it for "a couple of weeks." He further admitted that he was familiar enough with plaintiffs' customers and method of operation so that he had a good

idea of what appeared on the chart even after he disposed of it. He also stated that he was able to determine the approximate expiration date so as to permit his own salesmen to get to a community in advance of plaintiffs'.

Although the anticipated expiration date in one community differed from that in another, plaintiffs have always been able to estimate the contract completion time by use of the master chart. This was, in fact, the purpose for making such a chart. The type of advertising service sold by plaintiffs is somewhat restricted to areas of growth and there is only a small variety of businesses which buy the service. Moreover, plaintiffs can only deal with one merchant in each type of business in each town. In order to warrant the publication of a book for any particular community, 21 accounts were necessary to produe a profit. Inability to maintain the minimum number of contracts in a particular city would result in a border line operation or possibly a loss.

One month after leaving plaintiffs' employ, defendant Snetsinger initiated a publication similar to plaintiffs' and formed the Mass Company, Inc., to run the business. Defendants' publication was called "My Little Red Book." It was similar in all respects to plaintiffs' (personalized telephone directory, coupons, subscribers charged 15 cents per book, et cetera), except that the book was red instead of green. The Mass Company's sales staff consisted of four persons, two of whom were former employees of plaintiffs. In addition, another former employee was employed in the distribution department.

One of plaintiffs' salesmen, Tom Linthicum testified that defendant Snetsinger visited him shortly after leaving plaintiffs' employ. Snetsinger stated that he and some other persons, including former employees of plaintiffs, were going to start a competitive business and that there would be an opportunity for Linthicum to have a sales position. Snetsinger further stated to Linthicum that "they were going to take over the accounts in Northern California, they had developed the business, it was their business. They felt that the customers were loyal to them because they didn't know the company [i.e., plaintiffs] but they did know the individual salesmen. They figured that each salesman would take about $35,000 of the business away from Names 'N Places and in about six months' time there would be no more Name 'N Places in Northern California and possibly nowhere else, that they were going to be in these towns before the time for renewal . . .

and be able to take their customers away from Names 'N Places." Snetsinger also said that "he had a friend in the company who knew of all that was going on, he wouldn't say who it was, but that they would know when the towns were ready for expiration and ready for renewal and would keep them fully informed of all the happenings. . . ."

Martin Heller, another of plaintiffs' salesmen, testified to a similar conversation which defendant Snetsinger had with him.

Snetsinger testified that as manager of the Mass Company, Inc., he sent salesmen into a particular community so that they would arrive before plaintiffs' salesmen. It was his intentional and deliberate practice to have his salesmen call on the merchants who were the customers of Names 'N Places. Snetsinger stated that his primary reason for instructing his salesmen so to proceed was that plaintiffs' customers were often the best prospects and were most likely to want such service. Snetsinger also admitted that in some instances his salesmen would seek out *only* those accounts in a certain type of business who were already under contract with plaintiffs. Snetsinger estimated that almost 25 per cent of his customers were former customers of plaintiffs; and he stated that as a result of the preliminary injunction issued against him and his company, a substantial loss of business had been sustained. Snetsinger acknowledged the possession of a series of check stubs which indicated the names of all of plaintiffs' subscribers and which were an additional source of information for the contract expiration dates of plaintiffs' subscribers.

Defendant Holland, another former employee of plaintiffs, testified that in one town where he solicited for the Mass Company he had a copy of Names 'N Places with him and used it to find the merchants whom he had previously solicited on behalf of plaintiffs' business but whose names he was unable to remember. He admitted that he would usually solicit merchants who were Names 'N Places subscribers and whose contracts were nearing an end. In one town he called upon all of the Names 'N Places subscribers, with the exception of one subscriber whom he had known as often having been behind in paying the account with plaintiffs.

The depositions of several of plaintiffs' subscribers were introduced in evidence by stipulation of the parties. All of these persons stated that they were satisfied with plaintiffs' service and would have renewed their contracts in the ordi-

nary course of events; that prior to the time that their Names 'N Places subscription expired, a salesman from defendants' service came into their place of business and induced, or tried to induce, them to subscribe to that service. In many instances the salesman was a former employee of plaintiffs. Some of the subscribers were told that Names 'N Places was no longer going to operate in that part of the state and that defendants' service would take its place by mutual agreement; others were led to believe that they were still subscribing to plaintiffs' service but that it was now using a different name. Several of these subscribers entered into contracts for defendants' service.

As a result of defendants' competition plaintiffs' gross sales were reduced from about $37,000 in the year prior to commencement of defendants' publication to approximately $20,000 in the following year. This reduction produced a $7,700 decline in net profits.

Defendants' first contention is apparently that plaintiffs were as a matter of law entitled to no relief. Defendants assert that this case is not governed by the so-called "route cases," such as *George* v. *Burdusis,* 21 Cal.2d 153 [130 P.2d 399]; *California Intelligence Bureau* v. *Cunningham,* 83 Cal. App.2d 197 [188 P.2d 303]; *Wallich* v. *Koren,* 80 Cal.App.2d 223 [181 P.2d 682]. Rather, defendants contend that the facts bring this case within the line of decisions illustrated by *Continental Car-Na-Var Corp.* v. *Moseley,* 24 Cal.2d 104 [148 P.2d 9]; *Aetna Bldg. Maintenance Co.* v. *West,* 39 Cal.2d 198 [246 P.2d 11]; *Avocado Sales Co.* v. *Wyse,* 122 Cal.App. 627 [10 P.2d 485]; *Mathews Paint Co.* v. *Seaside Paint & Lacquer Co.,* 148 Cal.App.2d 168 [306 P.2d 113].

█ The law governing this problem is clearly stated in *Alex Foods, Inc.* v. *Metcalfe,* 137 Cal.App.2d 415, 423-424 [290 P.2d 646]; "Section 2860 of the Labor Code provides that everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment. A customer list built up by the employer over a period of years is his property, and its use by a former employee for his own advantage will be enjoined. [Citation.] █ Equity will intervene to restrain an employee from divulging confidential information gained in the course of his employment or using such information to his employer's prejudice. █ On the other hand,

every individual possesses a form of property, the right to pursue any calling, business or profession he may choose. ▇ A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, *provided such competition is fairly and legally conducted.* ▇ Equity will, to the fullest extent, protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. [Citation.]'' (Emphasis added.)

▇ As a guide in the determination of what constitutes unfair competition by a former employee, the courts have set forth the following elements: ''(1) The information was confidential and not readily accessible to competitors; (2) The former employee solicited the customers of his former employer with intent to injure him; (3) The former employee sought out certain preferred customers whose trade is particularly profitable and whose identities are not generally known to the trade; (4) The business is such that a customer will ordinarily patronize only one concern; (5) The established business relationship between the customer and the former employer would normally continue unless interfered with.'' (*Alex Foods, Inc.* v. *Metcalfe, supra,* p. 425; *Aetna Bldg. Maintenance Co.* v. *West, supra,* pp. 204-205.)

While it is obvious that the case at bar does not involve a retail delivery route, we believe that the principles laid down in the ''route cases'' are here applicable. The factual picture in this case discloses that each of the five elements mentioned above is present. With regard to the first element, it is apparent that defendants made use of information which was confidential and not readily accessible to competitors. Defendants argue that the information concerning plaintiffs' customers was not confidential since no lists were furnished to the salesmen and since each salesman used obvious methods in choosing prospective customers—telephone directory, newspaper, driving through a town and picking the best looking stores, et cetera. However, these sources would not disclose the persons who ultimately made up the list of plaintiffs' customers. Some of the merchants approached by plaintiffs' salesmen declined to purchase this type of advertising. It

was the list of persons who *did* purchase plaintiffs' service that constituted confidential information. (*California Intelligence Bureau* v. *Cunningham, supra,* p. 203.) Plaintiffs expended considerable time, labor and money in building up a list of subscribers who accepted and subscribed to their unique advertising medium; this group of merchants would be more likely to purchase such a service since they had already been ''sold'' on its name as a method of advertising.

And it is not necessary to show that the employee actually used such a list if he carried it in his mind or memory. (*George* v. *Burdusis, supra,* p. 160; *Alex Foods, Inc.* v. *Metcalfe, supra,* p. 425.) Defendants also argue that plaintiffs' salesmen were in the nature of independent contractors who chose their own customers and established the business relationship between the customer and the advertising service, thus negating the possibility of any confidential information.

But it does not matter that the former employee may have originally secured the customer's business for the former employer; it is the identity of the customers who have been secured that constitutes the confidential information, and ''the additional influence of the friendly contact of the former employee with the persons whose business he would carry to his new connection brings the solicitation within the condemnation of unfair competition.'' (*George* v. *Burdusis, supra,* p. 163; *Wallich* v. *Koren, supra,* p. 226.) While the identity of some of plaintiffs' subscribers may have been easily ascertainable by competitors, it cannot be said that the entire list of plaintiffs' subscribers (who were scattered all over the state) was ''readily accessible to competitors.''

Moreover, even if the customer list does not in itself constitute such a trade secret as would warrant the court's intervention, the list becomes a trade secret when there is other confidential information as to the customers on the list. (*George* v. *Burdusis, supra,* p. 160; *Wallich* v. *Koren, supra,* p. 226; *Alex Foods, Inc.* v. *Metcalfe, supra,* p. 427.) Only a few of plaintiffs' employees had access to the master chart which was kept for the purpose of determining the approximate expiration date of the contracts in a particular area. This information was a valuable asset since a salesman was more likely to obtain a subscription to the service he represented by approaching the subscriber when the latter's existing contract was about to expire. It is clear from the facts that defendants used this knowledge to solicit plaintiffs' subscribers in each town even before plaintiffs' salesmen could

reach them. ▮▮▮▮ The list of plaintiffs' subscribers in conjunction with the date concerning contract expiration dates was not readily accessible to competitors and constituted confidential information the unauthorized use of which a court of equity will prevent. As to the second element, defendants' intent to injure plaintiffs could reasonably be inferred from Snetsinger's admissions and from the evidence concerning defendants' methods of obtaining subscribers. On this question the trial court found: "That it is true that each and all of the acts and conduct of the defendants was motivated by express malice and with the express intention of deliberately and maliciously injuring plaintiffs in their business." Defendants do not challenge the sufficiency of the evidence to support this finding. The third element is also present in that defendants' salesmen sought out plaintiffs' subscribers as their primary source of subscriptions in most towns. It was admitted that these actions were prompted by the belief that such subscribers were the best business prospects since they were already familiar with, and receptive to, this unusual form of advertising. Under such circumstances it may be said that all plaintiffs' subscribers constituted a preferred list of business prospects. (See *California Intelligence Bureau* v. *Cunningham, supra,* p. 204.) Moreover, it was shown that in one instance a salesman for defendants solicited every Names 'N Places subscriber in a town except one, and that particular subscriber was known by the salesman to be consistently behind in payments. It may thus be inferred that defendants were not merely reaping plaintiffs' particularly profitable harvest; they were separating the wheat from the chaff as well. The information gained at plaintiffs' expense was being used to defendants' advantage. Defendants argue that the identity of plaintiffs' subscribers was no secret, that it was known by each member of the public who had a Names 'N Places book, and that it could be ascertained by anyone who would pass a place of business and see a Names 'N Places decal in the window. But it appears that only some of plaintiffs' subscribers displayed decals. And defendants overlook the fact that a different Names 'N Places book was printed for each town. Plaintiffs' business was statewide. The books were distributed only to new householders and to the subscribing merchants. A competitor would have to go to great lengths to obtain a copy of each of the different books which plaintiffs publish. While competing services might have access to the identity of some

of plaintiffs' subscribers in a given town, the complete list of such subscribers throughout the state could be learned only by spending much time and money canvassing each town in which plaintiffs operated *or by using information learned by someone while in plaintiffs' employ.* Moreover, the approximate expiration dates of plaintiffs' contracts, which added substantially to the value of knowing the identity of plaintiffs' subscribers, was obviously unknown to the trade in this field. As to the fourth element, the evidence indicates that a merchant would ordinarily subscribe to only one advertising service of the type involved here. And as to the fifth element, the evidence that 50 per cent to 70 per cent of plaintiffs' subscribers renew their contracts and the statements in the depositions of several of plaintiffs' subscribers give rise to the inference that the established business relationship would more often than not continue unless interfered with.

The case most heavily relied upon by defendants (*Continental Car-Na-Var Corp.* v. *Moseley, supra*) also supports our conclusion that the principles enunciated in the "route cases" govern the instant case. The very grounds upon which that case distinguished the "route cases" indicate the similarity between those cases and the one at bar. The court in the Moseley case stated at page 109 that: "This case is readily distinguishable from the so-called 'route' cases, where the business of serving the customer is based upon regular calls at definite periods, establishing a business relationship between the customer and the company, which, unless interfered with, normally will continue. Here there is no showing that in the normal course of events, plaintiff would have continued to sell to any of its customers on the list. In the 'route' cases the services rendered or the products sold were essentially the same, and the quality of the service rendered is similar. In the case of a salesman in a commercial field, there is no assurance of an order unless he can satisfy the customer that his merchandise is better, cheaper or more salable than that of his competitor. The customer usually desires to examine, inspect and compare merchandise and prices offered to him. Each sale is a distinct transaction, not necessarily implying that another will follow. [Citation.]" In the instant case the business is based upon making regular calls at definite periods, usually once a year. The business relationship, unless interfered with, was shown normally to continue; many of the plaintiffs' subscribers solicited by defend-

ants had more than once renewed their contracts with plaintiffs. The services rendered by plaintiffs and defendants were almost exactly the same, and the quality of the service was likewise similar. While the Moseley case dealt with the question of commercial salesmen who had no assurance of an order unless they could satisfy the prospective buyer that their wares were more desirable than competing products, the case at bar involves a situation where prior dealings did affect the probability of continued contractual relations since a subscriber who was satisfied with plaintiffs' form of advertising was likely to renew his contract with *plaintiffs*. This is unlike the commercial sales situation where each sale is a distinct transaction, not necessarily implying that another will follow. Moreover, in the Moseley case it was not disputed that the names and addresses of businesses using the type of products sold by plaintiff were commonly known to the trade. And the court also relied on the fact that there were no unfair trade practices as were readily apparent in this case. The other cases relied upon by defendants are likewise distinguishable from the present case for many of the reasons just noted.

In addition, the observations of the court in *Alex Foods, Inc.* v. *Metcalfe, supra,* pages 426-427, are particularly appropriate here: ''Regardless of the classification into which the facts herein mentioned bring this case, it is clear that if the continuance of an employer's trade depends on keeping secret the names of customers or other valuable information known to such employer, his employee, having gained knowledge of such secrets in the course of his employment, cannot thereafter utilize such knowledge to the prejudice of his former employer. Independent of an express contract, equity will enjoin the disclosure of confidential knowledge of trade secrets which a former employee learned in the course of his employment. The fact that a defendant was employed by plaintiff for years during which he learned the names, addresses, and requirements of plaintiff's customers justifies injunctive relief where the defendant undertook to use such information in unfair competition to the detriment of plaintiff. Such knowledge is a part of the good will of the business and is a trade secret. *A list of customers is a trade secret if there is confidential information as to such customers. To act upon it is an improper use of confidential information and amounts to unfair competition. . . .* This rule applies generally to trade route cases *as well as others involving a knowledge of the* [customers'] *. . . buying*

*habits.* [Citation.]'' (Emphasis added.) In the instant case knowledge of the contract expiration dates of plaintiffs' subscribers was the secret to their ''buying habits,'' since these subscribers would be in the market for such advertising services shortly before their existing contracts were to expire.

In *Wallich* v. *Koren, supra,* page 227, this court stated: ''While the judgment is entitled to affirmance upon the facts above discussed, it is further fortified by evidence which warranted the inference that appellant designedly set out to pirate upon the established reputation and good will of respondent.'' The court went on to relate circumstances similar to those in the present case whereby subscribers were led to believe that they were still dealing with plaintiffs' service or that Names 'N Places was being replaced by My Little Red Book with the mutual understanding of all involved. The court thus found that the unfair trade practices which were carried on by the defendant formed an independent basis entitling the plaintiff to injunctive relief. The following statement is applicable to the situation here involved: ''There is nothing to be said in extenuation of such deception as was practiced in the cited instances. For the entire course of appellant's conduct the law can offer nothing but censure. Our civilization has passed beyond the era of cutthroat competition. Not only do business men deprecate practices that deprive one's neighbor of his rights, but the ethic that abounds among upright men is to let rivals live and, if a competitor deserves success, so to act as to defeat the piracy of such advantages as he may have honorably acquired.'' (*Wallich* v. *Koren, supra,* p. 228.)

Defendants' second contention is that ''equity will not enjoin a former employee from going into business competing with his former employer, and using the knowledge he has gained, where, through no fault of the former employee he is discharged by his former employer'' (two of the defendants were originally discharged by plaintiffs). This contention is without merit. Whether the employee or the employer severs the relationship is of no consequence; the determinative factors are the nature of the information the employee takes away with him, the use he makes thereof, and his subsequent conduct. In *Alex Foods, Inc.* v. *Metcalfe, supra,* the court affirmed an order granting injunctive relief even though it was the former employer who originally severed the relationship.

Defendants' next contention is that plaintiffs should be denied any relief because they did not come into court with "clean hands." Defendants' evidence in this regard showed that on two occasions in Modesto a salesman from Names 'N Places visited a merchant who had never before been a subscriber to plaintiffs' service but who had recently subscribed to defendants' service. In each instance the salesman expressed the belief that My Little Red Book would not be published in that area because of the quota requirements and the existence of a temporary injunction against defendants; the salesman then persuaded each of these merchants to subscribe to plaintiffs' service on the understanding that the contract was not to take effect unless My Little Red Book was not published in the area. Each contract expressed this condition on its face. From these facts the trial court could reasonably infer that plaintiffs did come into court with clean hands. The salesman who solicited these merchants had never worked for defendants and had no way of knowing in advance that they had already subscribed to defendants' service. He did not solicit these merchants to take plaintiffs' service *instead of* defendants'; he only requested that they subscribe to Names 'N Places on the condition that My Little Red Book was not published. While these tactics may be disapproved from an ethical standpoint, they are certainly not of the same magnitude as the unfair practices resorted to by defendants. They do not constitute unclean hands so as to prevent equitable relief under the facts in this case.

Defendants' final contention is that the court erred in granting compensatory damages because the evidence was too uncertain and speculative to establish loss of profits. Defendants miss the distinction which is pointed out in *Continental Car-Na-Var Corp.* v. *Moseley, supra,* page 113: "Evidence to establish profits must not be uncertain or speculative. This rule does not apply to uncertainty as to the amount of the profits that would have been derived, but to uncertainty or speculation as to whether the loss of profits was the result of the wrong and whether any such profits would have been derived at all." There is abundant evidence in the present case from which the trial court could infer that the sharp decline in plaintiffs' profits was directly caused by defendants' wrongful acts. It was admitted that defendants' accounts included 58 former customers of plaintiffs; the depositions introduced by plaintiffs indicated that many of these customers would have renewed

their contracts with plaintiffs but for the actions of defendants. Defendants rely on the fact that only 50 per cent to 70 per cent of plaintiffs' customers renew their contracts and argue from this that computation of damages is impossible.

██ But it is clear that some damage to plaintiffs' business was being caused by defendants and "one whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness." (*Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [149 P.2d 177].)

Defendants also argue that plaintiffs claim as part of their damages the losses suffered in Las Vegas, Nevada, and yet defendants do not publish a book there. But it does not appear that the trial court considered plaintiffs' loss in Las Vegas in awarding damages. The exhibit which shows plaintiffs' losses lists all the cities where plaintiffs operate, Las Vegas included. The sales in Las Vegas declined in the amount of $384. ██ Even eliminating this figure from the total reduction in net profits, a $7,300 decrease in such profits remains. If we assume that only 50 per cent of the 58 former customers of plaintiffs who had been persuaded to subscribe to defendants' service would have renewed their contracts with plaintiffs but for defendants' interference, well over half of the decrease in net profits is accounted for. And it should be noted that the 50 per cent estimate appears to be conservative in light of the fact that many of the subscribers upon whom defendants called had more than once renewed their contracts with plaintiffs. The evidence amply supports the trial court's award of $3,500.

The judgment is affirmed.

Ashburn, J., and Richards, J. pro tem.,* concurred.

A petition for a rehearing was denied December 13, 1957, and appellants' petition for a hearing by the Supreme Court was denied January 15, 1958.

---

*Assigned by Chairman of Judicial Council.