[Civ. No. 6886. Fourth Dist. Jan. 2, 1963.]

AMERICAN LOAN CORPORATION et al., Plaintiffs and Respondents, v. CALIFORNIA COMMERCIAL CORPORATION et al., Defendants and Appellants.

516

Thompson & Colegate for Defendants and Appellants.

Marvin Bledsoe, in pro. per., for Plaintiffs and Respondents.

SHEPARD, J.—This is an appeal by defendants from a judgment for plaintiffs in an action for damages and injunction on account of alleged unfair use of business secrets.

## FACTS

Plaintiff Marvin Bledsoe is the sole stockholder in the corporate plaintiff. He is a licensed real estate broker. Defendant John M. Rooney is the salaried president of the corporate defendant, which has three directors, himself, his mother and his wife. No stock was ever issued and there have been no corporate profits.

Plaintiffs commenced an investment business in Riverside County in 1954 consisting principally of purchase and sale of secured loans on real property. In January 1955, defendant Rooney became an employee of plaintiff. At that time plaintiffs had about 25 customers. When Rooney terminated his employment, about August 1, 1956, plaintiffs had 125 to 150 customers. Rooney organized the corporate defendant August 13, 1956, and engaged in the same type of investment business. The plaintiffs received from some of their investors deposits of money for purchase of securities. Some deposited money and received an interest check monthly. Those customers repeating deposits in the trust account for buying trust deeds were termed "investors" by Bledsoe. He testified that out of about 150 customers on his list, 25 or 30 were "investors." He named 26. He described several methods of financing through what amounted to loans with trust deeds as collateral security as well as direct sales of the securities themselves and some unsecured accounts. Part of the profits of the business came from fees for new loans as well as brokerage fees. He described the operation as a complicated business which took time to learn, stating that plaintiffs' method of "trust account" operation with a reserve account for delinquent collections was peculiar to plaintiffs until defendants opened their business; that he knew of no other company using it and that in order that it be understood by employees, he developed, over a period of months, for the confidential use of employees, a training manual covering all phases of the business. Rooney had a copy of this manual. In May 1956, by letter, Rooney indicated an intention to leave plaintiffs' business but discussions showed that he wanted to have a sort of semi-attachment to plaintiffs' business, by which he would service plaintiffs' customers and pay 10 per cent of the gross profits to plaintiffs.

Bledsoe further testified that this tentative agreement was under discussion between Rooney and himself during the summer of 1956 to the general effect that Rooney would open an office in the town of Arlington; that Rooney would pay to plaintiffs 10 per cent of the gross received by Rooney from customers of plaintiffs. Apparently Bledsoe believed that an agreement had been reached for Rooney to operate the Arlington office as a part of or in cooperation with plaintiffs, but about the middle of October 1956 Rooney denied the agreement and refused to pay. At that time plaintiffs owned the Riverside and Pomona offices but the San Bernardino and Los Angeles offices were owned by Bledsoe's brother and brother-in-law. They had no license and the inference is that they operated under plaintiffs' license. Bledsoe estimated a net commission profit of 10 per cent.

Bledsoe identified many of his customers as living outside the Riverside community, examples being customers from Banning, Venice, San Bernardino, Elsinore, Los Angeles, and two in Texas. Most loans involved recordation of a deed of trust but the beneficiaries' address was indicated as of plaintiffs' place of business. The addresses of those customers not living in the Riverside area were not easily obtainable from any other source than plaintiffs' card index file. Only the contacts made by plaintiff would convey the knowledge of the type of investment the customer would be attracted to.

Witness Hammett largely corroborated Bledsoe's testimony. He explained that the escrow business was handled by a subsidiary corporation called the American Interest Corporation, which was part of plaintiff's business; that Rooney was made president of that corporation and was an officer of plaintiff corporation; that in July 1956 Rooney stated he was going to Arlington to open a branch office of plaintiff corporation; that Rooney, after opening the Arlington office, did, on some occasions, in response to telephone inquiries, promise to send in something to the plaintiffs on account but finally, about October, said he would pay nothing. During these conversations, numbering five or six, the payment by Rooney to plaintiffs of 10 per cent of the commissions collected by Rooney from transactions with regular customers of plaintiffs was discussed; that Rooney stated that the commission of 10 per cent would come to the Riverside office (meaning plaintiffs' office).

Witness Thomas, a current competitor of plaintiffs, testified

to several elements of plaintiffs' business that were unique in this type of business in the Riverside-San Bernardino area, including the trust account, the borrower escrow instruction, the payment purchase plan; the similarity of plaintiffs' operation to some parts of bank operations; that a list of regular investors is not easy to obtain; that he has a regular investors' list of his own with each investor's peculiarities listed; that the only way he knows to obtain the details of the payment purchase plan is to buy a franchise from the National Mortgage Company, upon the purchase of which a book explaining the plan is furnished; that the only such franchise purchase he knew of cost $3,500; that the witness' forms are not available to competitors; that the witness tried to locate an investor named as one of plaintiffs' customers but could not do so; that to get started he advertised in the newspaper and inquired among friends.

The testimony for defendants was that John Rooney was employed by plaintiffs during 1955 and part of 1956; that he had been an attorney for some years in Wisconsin; that plaintiffs had a list of investors in a card index file totalling 125 to 150; that Rooney set up his trust account operation in a fashion similar to plaintiffs'; that he took duplicates of plaintiffs' card index customer list when he left plaintiffs' business, having one of plaintiffs' secretaries type a list from the cards; that when he went into business he sent an announcement thereof to all those on plaintiffs' investor list who were classified in the evidence as repeat investors; Rooney was vague about what material was contained in the announcement; defendants made personal contact with at least 15 of said investors; Rooney sent them his monthly bulletin; that the recorded trust deed which defendants referred to as a source of public information regarding investors does not give pertinent addresses or other information contained in said card index and Rooney does not know any other single source of such information but that it could be accumulated. Defendants' books showed that total commissions were $79,710.33 from about 600 customer transactions; that of this number more than 350 were with customers on the list Rooney had taken from plaintiffs. Testimony of defendants further showed that for the period of August 1956 through July 1957 the total commissions received by defendants from customers appearing on the list taken from plaintiffs were $23,377; that on June 27, 1956, defendant Rooney received a letter from

plaintiffs stating that plaintiffs were about to get out a brochure showing defendants' Arlington address; defendants replied on June 30, 1956, giving such address without indicating that it should not be used. Bledsoe had testified that as a result of his understanding with defendant Rooney, Bledsoe had printed five to ten thousand brochures with Rooney's name and Arlington address included thereon; that some of these were sent out, but that as soon as Rooney denied the contract the rest were destroyed.

## SUFFICIENCY OF EVIDENCE

Defendants contend that the evidence was insufficient, as a matter of law, to sustain the findings and judgment. ▮▮ In considering such a contention we must first bear in mind the oft repeated rule that,

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact,' and 'When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.' [Citations.]

▮ " 'Appellate courts . . . if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical.' " (*Brewer* v. *Simpson,* 53 Cal.2d 567, 583 [1, 2] [2 Cal.Rptr. 609, 349 P.2d 289], quoting from *Grainger* v. *Antoyan,* 48 Cal.2d 805, 807 [1, 2] [313 P.2d 848].)

▮ Respecting the type of problem particularly presented by the case at bar it has been said that the basic reason that courts of equity will intervene to restrain the unfair use of trade secrets of an employer by a former employee who obtained such secrets as a result of his employment is that there is ". . . an implied contract that an employee will not divulge confidential knowledge gained in the course of his employment, or use such information to his employer's prejudice." (*Empire Steam Laundry* v. *Lozier,* 165 Cal. 95, 102 [130 P. 1180, Ann. Cas. 1914C 628, 44 L.R.A. N.S. 1159].) See also *Pasadena Ice Co.* v. *Reeder,* 206 Cal. 697, 702 [276 P.

995]; *By-Buk Co.* v. *Printed Cellophane Tape Co.*, 163 Cal. App.2d 157, 164 [2, 3] [329 P.2d 147].

■ However, the courts will use their power to enjoin with due regard to the right of every person to freely engage in a lawful occupation and will not enjoin a former employee from doing business with a customer of a former employer unless there is some unfair use by such former employee of business secrets which such employee gained possession of confidentially during employment. (*Fortna* v. *Martin,* 158 Cal.App.2d 634, 638 [2, 3] [323 P.2d 146]; *Continental Car-Na-Var Corp.* v. *Moseley,* 24 Cal.2d 104, 110 [4, 5] [148 P.2d 9]; *Paraco, Inc.* v. *Owens,* 166 Cal.App.2d 777, 781 [2, 3] [333 P.2d 360].)

■ It has been said that ''. . . to obtain relief against a former employee it must be shown: (1) The information was confidential and not readily accessible to competitors; (2) The former employee solicited the customers of his former employer with intent to injure him; (3) The former employee sought out certain preferred customers whose trade is particularly profitable and whose identities are not generally known to the trade; (4) The business is such that a customer will ordinarily patronize only one concern; (5) The established business relationship between the customer and the former employer would normally continue unless interfered with.'' (*Aetna Bldg. Maintenance Co.* v. *West,* 39 Cal.2d 198, 204 [8] [246 P.2d 11].)

See also *George* v. *Burdusis,* 21 Cal.2d 153, 159, 160 [1] [130 P.2d 399]; *California Intelligence Bureau* v. *Cunningham,* 83 Cal.App.2d 197, 202, 203 [2a] [188 P.2d 303]; *Paraco, Inc.* v. *Owens, supra,* p. 782 [4]; *Reid* v. *Mass Co., Inc.,* 155 Cal.App.2d 293, 301 [6] [318 P.2d 54].

■ It has also been said that ''The fundamental difference in the decisions, as we read them, is whether in a given case the knowledge gained by an employee is secret and confidential. If it is, its use by a former employee will be enjoined. If it is not, its use by a former employee will not be enjoined. Some knowledge gained by an employee is of such a general character that equity will not restrict its later use. An employee has a right, after cessation of employment, to use anything that is not the property of his employer. Trade and business secrets and confidential information are the property of the employer and cannot be used by the employee for his own benefit. ■ A list of subscribers of a service, built up

by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer, a part of the good will of his business and, in some instances, his entire business. Knowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice.'' (*California Intelligence Bureau* v. *Cunningham, supra,* p. 203 [3, 4].) See also *Gordon* v. *Landau,* 49 Cal.2d 690, 694 [2] [321 P.2d 456]; *Alex Foods, Inc.* v. *Metcalfe,* 137 Cal.App.2d 415, 423, 424 [1] [290 P.2d 646].

With these general principles in mind we are satisfied that, when we resolve all conflicting evidence and reasonably deducible inferences in favor of the judgment, there is sufficient evidence to support it.

First, the evidence shows that the information relative to the conduct of the business was of a type not readily obtainable in general business circles in the Riverside-San Bernardino area; that plaintiffs spent several months of study, many hundreds of dollars in tutelage, and experience in developing a particularly complicated type of approach to sale of real estate secured credits on a piecemeal basis; that the only other available source of such information known to any witness was by obtaining membership in a national organization at a cost of $3,500; that the list of customers, contrary to defendants' contention, was *not* easily obtainable from recorded instrument lists nor was the information as to the purchasing habits of these customers obtainable in any other way than by reference to the index cards and Rooney's personal memory. The very fact that 65 per cent of defendants' transactions were with plaintiffs' customers is a circumstance which partly corroborates the deducible inference of confidential information.

Second, even before defendant Rooney had openly declared himself independent of plaintiff Bledsoe, he had one of Bledsoe's secretaries prepare a copy of the list and he took a duplicate copy of the index cards with the customer's preference indications. Certainly if the list was easily obtainable there could have been no reason for him to be at pains to take duplicate copies of the card index or the list. He set up his business along the same general lines as plaintiffs. Defendant Rooney does not produce any testimony that he could have or did learn the intricate details of operation anywhere else. He sent letters to all those on the list as well as monthly

524

bulletins. It would be naive indeed to assume that the letter or bulletins were intended merely as general information. The fact that he obtained considerable business from a man named Forsvedt who lived in Texas was cited as an example. He protests that too much emphasis is placed on this example. Actually, there were a good many other customers whose address was *not* contained in any local directory. The inference of solicitation was legitimately drawn.

## DAMAGES

Defendants next claim that there was no evidence to support the finding of damage which was fixed at $4,838.78. We do not agree. By the testimony of defendants as well as that of plaintiffs, defendants started dealing with plaintiffs' customers, whose addresses and desires respecting investments he could only have learned from the confidential list he took from plaintiffs' files. It is evident that these dealings started even before Rooney tendered his resignation as an officer of plaintiff corporations and before defendant Rooney, in October 1956, flatly denied the contract. Rooney admits that over only a portion of the time involved he received $23,377.16 in commissions from plaintiffs' specially preferred customers. Other evidence showed total commissions of $79,710.33, and that 65 per cent of all defendant Rooney's transactions were with customers on the list he had taken from plaintiffs. Other evidence placed the net profit at 40 to 50 per cent of the gross. Without going any further it can be readily seen that the evidence might have supported a judgment of $5,000 to $11,000 or more. Plaintiffs can hardly complain of the use by the trial court of substantially the lowest percentage shown by the evidence. The judgment for damages was supported by the evidence. (*J. C. Peacock, Inc.* v. *Hasko,* 196 Cal.App.2d 363, 370 [2] [16 Cal.Rptr. 525] ; *Gordon* v. *Schwartz,* 147 Cal. App.2d 213, 216 [1] [305 P.2d 117] ; *Reid* v. *Mass Co., Inc., supra.*)

Where a corporate officer seizes business opportunities unfairly to the detriment of his company and in violation of his fiduciary duty the corporation is entitled to recover all the profit of the transaction. (*Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d 519, 533 [9] [256 P.2d 677].)

"One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness."

(*Tomlinson* v. *Wander Seed & Bulb Co.*, 177 Cal.App.2d 462, 474 [8] [2 Cal.Rptr. 310].)

INJUNCTION

Defendants next contend that the injunction is unwarranted and too broad. We have already pointed out evidence justifying the trial court in concluding that the list of customers was confidential and was unfairly used by defendants to the detriment of plaintiffs. The objectionable phase of the injunction criticized in *Western Electro-Plating Co.* v. *Henness*, 180 Cal.App.2d 442, 450 [4 Cal.Rptr. 434], is not present in the case here at bar. The injunction herein merely prohibits the defendants from soliciting further business from such customers. It is not too broad. (*Peerless Oakland Laundry Co.* v. *Hickman*, 205 Cal.App.2d 556, 559 [2-4] [23 Cal.Rptr. 105] ; *Ungar Electric Tools, Inc.* v. *Sid Ungar Co., Inc.*, 192 Cal.App.2d 398, 404 [7-8] [13 Cal.Rptr. 268].)

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.