[No. A074958. First Dist., Div. Two. Aug. 14, 1997.]

MORLIFE, INC., Plaintiff and Respondent, v.
LLOYD PERRY et al., Defendants and Appellants.

COUNSEL

Estrada & Thomson and William D. Thomson for Defendants and Appellants.

James P. McBride for Plaintiff and Respondent.

OPINION

RUVOLO, J.—Respondent Morlife, Inc. (Morlife) brought this suit for damages and injunctive relief against its former employees, appellants Lloyd Perry and Carl Bowersmith, who had resigned and joined with appellant Donald R. Meyers to form Burlingame Builders, Inc. (Burlingame), a direct competitor of Morlife in the commercial roof repair market. Morlife claimed appellants unfairly competed with it by misappropriating confidential customer information in violation of the Uniform Trade Secrets Act (UTSA)

(Civ. Code, § 3426 et seq.).[1] After a nonjury trial, the court found for Morlife, awarded it $39,293.47 in monetary damages, and granted injunctive relief. Applying the appropriate standard of review to the evidence before the court, we uphold the trial court's finding that Burlingame used trade secrets to compete unfairly with Morlife. We further find the monetary and injunctive relief granted against Burlingame was warranted by the evidence. Therefore, we affirm.

## FACTS

Morlife is in the business of inspecting, maintaining, and repairing roofs primarily for commercial properties. Before he terminated his employment with Morlife, Perry was its sales representative and had been with the company since its formation. During his employment, Perry signed an agreement not to use, duplicate, or disclose information about Morlife's customers in the event he terminated his employment. Bowersmith was employed by Morlife as its production manager. Perry and Bowersmith were in key positions at Morlife, and they necessarily had an intimate knowledge of the business and its customers.

In July 1993, appellants discussed the possibility of starting another roofing company. In October 1993, both Perry and Bowersmith resigned from Morlife. When Perry left Morlife's employ, he took his collection of customer business cards he had accumulated over his six years of employment. According to Perry's testimony at trial, the business cards represented approximately 75 to 80 percent of Morlife's customer base.

Burlingame began operations on November 1, 1993. Through letters, telephone calls, and personal visits, Perry contacted former Morlife customers seeking their business for his own newly formed company. In doing so, Perry used the customer business cards he took when he left Morlife. At the time of trial, Morlife identified 32 former customers who had switched their business to Burlingame.

When Morlife personnel learned appellants were actively soliciting business from Morlife customers, Morlife's legal counsel sent a cease-and-desist letter dated November 18, 1993. Appellants discussed the letter but decided to disregard it.

This lawsuit was filed charging appellants with misappropriation of trade secrets in violation of the UTSA and unfair competition under Business and

---

[1] All further unspecified statutory references are to the Civil Code.

Professions Code section 17200 et seq.[2] Morlife sought injunctive relief as well as compensatory and punitive damages. A nonjury trial was held during which the court heard highly controverted evidence. After the conclusion of trial, the court made several key findings:

1) Morlife's customer list constituted a trade secret as defined by the UTSA (§ 3426.1, subd. (d));

2) Appellants jointly misappropriated Morlife's trade secret by using knowledge of Morlife customers to solicit customers for Burlingame;

3) Morlife was entitled to $39,293.47 representing the unjust enrichment realized by appellants as a result of their misappropriation of Morlife's customer information.

In addition, appellants were permanently enjoined from doing business with any of the 32 Morlife customers who subsequently did business with Burlingame after being unlawfully solicited. Appellants were also enjoined from soliciting any Morlife customer that Perry and Bowersmith became aware of while working at Morlife.

On appeal we do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusions of the trial court, as well as the method by which it arrived at those conclusions, to determine whether they are legally correct and supported by substantial evidence. (See generally, *Klamath-Orleans Lumber, Inc.* v. *Miller* (1978) 87 Cal.App.3d 458, 464 [151 Cal.Rptr. 118]; *Greenly* v. *Cooper* (1978) 77 Cal.App.3d 382, 390 [143 Cal.Rptr. 514].)

OVERVIEW

Appellants repeatedly argue that the crux of this case "involves the right of an employee to leave the employment of his or her employer, open his or her own business and compete against the previous employer." While it has been legally recognized that a former employee may use general knowledge, skill, and experience acquired in his or her former employment in competition with a former employer, the former employee may not use confidential information or trade secrets in doing so.

Our Supreme Court recognized the delicate balance between promoting unfettered competition and protecting business from unfair conduct in *Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104 [148 P.2d 9]:

[2]In its complaint, Morlife did not set out any claim of unfair competition distinct from its claims under the UTSA, nor did it proffer any evidence or theory of unfair competition besides misappropriation of trade secrets. In rendering its decision, the court analyzed the case and awarded relief based solely on the law regarding trade secrets and confidentiality as codified by the UTSA, specifically noting that the result would not be different under the statutory remedies for unfair competition. Therefore, this court limits its discussion to misappropriation of trade secrets under the UTSA.

"Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. [Citation.]" (*Id.* at p. 110.)

To be sure, we acknowledge the important legal right of persons to engage in businesses and occupations of their choosing. Some would count this freedom as one of the most cherished commercial rights we possess. Yet also fundamental to the preservation of our free market economic system is the concomitant right to have the ingenuity and industry one invests in the success of the business or occupation protected from the gratuitous use of that "sweat-of-the-brow" by others.

In the factual context of this case, the trial court found appellants had gone beyond reliance on their general skills and knowledge resulting from their years of experience in the roofing industry and had improperly capitalized upon Morlife's trade secrets. Thus, they were correctly enjoined from continuing to compete under these circumstances, and were found liable to compensate their former employer for the benefit derived from that use.

### CONFIDENTIAL CUSTOMER LISTS AS TRADE SECRET

By enacting the UTSA in 1984, our Legislature added California to the long list of states[3] which have determined that the right of free competition does not include the right to use confidential work product of others. Of course, not all information generated during the course of a business enterprise is entitled to protection, and the UTSA limits the scope of statutory protection for such intellectual property as follows:

"(d) 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

"(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

---

[3]Forty-one other states have adopted the UTSA. See "Table of Jurisdictions Wherein Act Has Been Adopted" appended to division 4, part 1, title 5, 12A West's Ann. Civ. Code (1997) preceding § 3426, pp. 235-236.

"(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

██ Appellants contend Morlife's customer list[4] did not satisfy the statutory definition of "trade secret" because the identity of prospective customers for roof repair and maintenance is the type of information which is generally known in the industry. Appellants claim the undisputed evidence demonstrates "there is nothing inherently secret or confidential about Morlife's customer base as all commercial buildings will need either repairs to an existing roof or a new roof." These arguments, which are framed as "legal arguments," ignore the trial court's factual finding on this issue.

In concluding Morlife's customer list fell within the definition of a trade secret under the UTSA, the court found that "Morlife provides a relatively unusual roofing service, namely, commercial roof repair and maintenance, as distinguished from replacement roofing." Its customer list was "a compilation, developed over a period of years, of names, addresses, and contact persons, containing pricing information and knowledge about particular roofs and roofing needs of customers using its services: as such, it has independent economic value. The identity of those particular commercial buildings using such services is not generally known to the roofing industry." The court further emphasized "Morlife made reasonable efforts to maintain the secrecy of its customers' identity by limiting circulation of its customer lists and by advising its employees, including [appellants] Lloyd Perry and Carl Bowersmith, through an employment agreement and an employee handbook, that Morlife considered the information valuable and confidential." This court must accept the trial court's finding that Morlife's customer list was a trade secret unless the record reveals no substantial evidence to support it. (*Vacco Industries, Inc.* v. *Van Den Berg* (1992) 5 Cal.App.4th 34, 50 [6 Cal.Rptr.2d 602].)

██ With respect to the general availability of customer information, courts are reluctant to protect customer lists to the extent they embody information which is "readily ascertainable" through public sources, such as business directories. (*American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318, 1326 [228 Cal.Rptr. 713].) On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where

---

[4]The customer information at issue is not a physical list per se, but a compilation of names, addresses, and data derived both from business cards removed from Morlife's premises, and from the memory of Mr. Perry.

anyone could easily identify the entities as potential customers. (See *Klamath-Orleans Lumber, Inc.* v. *Miller, supra,* 87 Cal.App.3d at p. 461; *ABBA Rubber Co.* v. *Seaquist* (1991) 235 Cal.App.3d 1, 19-20 [286 Cal.Rptr. 518].) As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret. (*Courtesy Temporary Service, Inc.* v. *Camacho* (1990) 222 Cal.App.3d 1278, 1287 [272 Cal.Rptr. 352].)

The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a "substantial business advantage." (See *Klamath-Orleans Lumber, Inc.* v. *Miller, supra,* 87 Cal.App.3d at p. 465.) In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. (*Courtesy Temporary Service, Inc.* v. *Camacho, supra,* 222 Cal.App.3d at pp. 1287-1288.) Its use enables the former employee "to solicit both more selectively and more effectively." (*Klamath-Orleans Lumber, Inc.* v. *Miller, supra,* 87 Cal.App.3d at p. 466.)

In the case at bar, the court heard testimony that Morlife's customers were not readily ascertainable, but only discoverable with great effort, and the patronage of such customers was secured through the expenditure of considerable time and money. Morlife's president testified about the difficulty encountered by sales personnel in getting past the "gatekeepers" and identifying and gaining access to the actual decisionmakers with the authority to purchase roofing services. Morlife developed its customer base by investment in telemarketing, sales visits, mailings, advertising, membership in trade associations, referrals and research. Out of 100 persons contacted by the telemarketing department, only about 10 result in contacts. He estimated an initial visit by a Morlife salesperson costs the company $238.

While labeling information "trade secret" or "confidential information" does not conclusively establish that the information fits this description (*American Paper & Packaging Products, Inc.* v. *Kirgan, supra,* 183 Cal.App.3d at p. 1325; *Moss, Adams & Co.* v. *Shilling* (1986) 179 Cal.App.3d 124, 126, 130 [224 Cal.Rptr. 456]), it is nonetheless an important factor in establishing the value which was placed on the information and that it could not be readily derived from publicly available sources. Furthermore, "to afford protection to the employer, the information need not be in writing but may be in the employee's memory. [Citation.]" (*Greenly* v.

*Cooper* (1978) 77 Cal.App.3d 382, 392 [143 Cal.Rptr. 514].). The evidence referenced above is more than sufficient to merit the court's finding that the information used by appellants had independent economic value to Morlife and appellants, and was not generally known to the public in satisfaction of the first prong of the statutory definition of a "trade secret."

The record also amply supports the second prong; namely, that reasonable steps were taken by Morlife to protect the information from disclosure. Based upon the facts of this case, there is no doubt Morlife intended its customer information to remain secret and undertook steps to secure that end. The company president recognized the importance of the customer information to the company referring to it as its "main asset." He explained, "Without it, there's no business." For this reason customer information was stored on computer with restricted access. Moreover, in its employment contract signed by Perry, Morlife included a confidentiality provision expressly referring to its customer names and telephone numbers. The Morlife employee handbook contained an express statement that employees shall not use or disclose Morlife secrets or confidential information subsequent to their employment including "lists of present and future customers."

Thus, the record contains substantial evidence to satisfy the second, independent statutory requirement for trade secret protection by confirming that Morlife took reasonable steps to protect the information it claims was a trade secret from disclosure.

MISAPPROPRIATION

 Appellants next contend that even if Morlife proved its customer list deserved trade secret protection, Morlife failed to prove appellants "misappropriated" the trade secrets. Once an employer proves a customer list is entitled to trade secret protection, it must then prove that the former employee misappropriated the information to attain an unfair competitive advantage. Under the UTSA, the term "misappropriation" is defined to include the nonconsensual "[d]isclosure or use of a trade secret." (§ 3426.1, subd. (b)(2).)[5]

The trial court found appellants "jointly misappropriated" Morlife's customer list by using their knowledge about Morlife's customers to actively

---

[5]Section 3426.1 defines misappropriation in full as follows:

"(b) 'Misappropriation' means:

"(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

"(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

"(A) Used improper means to acquire knowledge of the trade secret; or

"solicit" customers for Burlingame. The court explained, "Perry and Bowersmith supplied names and addresses of Morlife customers for letters sent over Perry's name that solicited business for the new company. Perry and Bowersmith also made telephone calls and personal visits to companies they knew as a result of their employment with Morlife to solicit business for Burlingame."

In fact, appellants conceded at trial that they actively solicited business from former Morlife customers when they started Burlingame. When Perry testified, he readily admitted using the business cards he took from his employment with Morlife to contact potential customers for Burlingame. The letter sent to former Morlife customers over Perry's signature went beyond merely announcing his new affiliation and actively solicited business for his new company.[6] Former Morlife customers were contacted by telephone, and in some cases, with personal visits.

The question of whether a former employee's particular disclosure or use of customer information is permissible as falling within the right to use general knowledge and experience gained in former employment, or whether it constitutes a prohibited misuse of a former employer's trade secrets, has been the frequent subject of litigation in California. While California courts have shown a reluctance to impose an unconditional prohibition on doing business with customers of the former employer, they have prohibited the unlawful use of trade secrets to solicit those customers. (See, e.g., *Klamath-Orleans Lumber, Inc.* v. *Miller, supra*, 87 Cal.App.3d at pp. 464-466; *American Credit Indemnity Co.* v. *Sacks* (1989) 213 Cal.App.3d 622 [262 Cal.Rptr. 92].). In cases decided both before and after the adoption of the UTSA, the decisions have equated acts of solicitation with "use" or "misappropriation" of protected information.

---

"(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

"(i) Derived from or through a person who had utilized improper means to acquire it;

"(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

"(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

"(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake."

Appellants do not argue that their manner of acquiring Morlife's customer information failed to meet the requirements of section 3426.1, subdivision (b)(2)(B)(i)-(iii), if the trial court was otherwise correct in finding the information to be a trade secret.

[6]The letter indicates, "I've joined forces with other roofing and general construction professionals to bring you the next generation of roofing companies." After describing the services offered, the letter ends with, "As always, you have my commitment to provide you with timely, dependable, professional solutions to alleviate your roofing problems. With rainy weather on the doorstep, let's talk soon about how we can prevent or minimize your headaches and costs."

In *Aetna Bldg. Maintenance Co.* v. *West* (1952) 39 Cal.2d 198 [246 P.2d 11], our Supreme Court provided this rough definition of solicitation: " 'Solicit' . . . means: 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; . . . [Citation.]" (*Id.* at pp. 203-204.) By contrast, "[m]erely informing customers of one's former employer of a change in employment, without more, is not solicitation." (*Id.* at p. 204.)

*American Credit Indemnity Co.* v. *Sacks, supra,* 213 Cal.App.3d 622, is a case with obvious parallels to the present one. There, ACI, an insurance underwriter, sued a former sales employee, Sacks, who formed a competing business and used a customer list to send a letter to approximately 50 ACI policyholders she had personally serviced. The letter stated in relevant part: " '[I] have left [ACI] and am very pleased to announce the formation of an independent insurance agency. . . . If you would like to learn more about the [new company's] policy, I will be happy to discuss it in detail with you when you are ready to review your ongoing credit insurance needs at renewal time.' " (*Id.* at p. 626.)

In finding Sacks had misappropriated trade secrets in violation of the UTSA and should be enjoined, the court reasoned as follows: (1) The customer list used by Sacks had potential economic value, since it allowed a "competitor to direct sales efforts to the elite 6.5 percent of those potential customers which already have evinced a predisposition to purchase credit insurance." (213 Cal.App.3d at p. 631.) (2) ACI took reasonable steps to keep its customer information secret, including confidentiality agreements with its employees covering ACI's "client list, expiration date of policies, lists of business leads, claims histories, and related client information." (*Ibid.*) (3) Sacks' letter and follow-up telephone calls to clients went beyond a professional announcement and amounted to "solicitation." (*Id.* at pp. 636-637.) As the court put it: "[the letter] personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies [her new company] can provide. . . . [¶] Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business. Sacks, in a word, solicited." (*Ibid.*; see also *Courtesy Temporary Service, Inc.* v. *Camacho, supra,* 222 Cal.App.3d at p. 1285.)

In insisting both their disclosure and use of customer information were not actionable, appellants rely on *Moss, Adams & Co.* v. *Shilling, supra,* 179 Cal.App.3d 124, which held, as a matter of law, that an employee largely responsible for securing a former employer's customers is entitled to solicit their continued patronage after leaving his or her previous employment. (*Id.* at p. 129.) The court reasoned that a former employee's personal relationship

with the customer negated the information's trade secret status as the former employee could not be compelled to "wipe clean" his or her memory. (*Ibid.*) The *Sacks* decision disagreed with *Moss, Adams* on this point, remarking that "the fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue," and that "[p]roviding personal service to a customer whose identity is a trade secret does not thereafter render that customer fair game for solicitation." (213 Cal.App.3d at p. 636.) We agree with *Sacks* that the distinction *Moss, Adams* makes between former employees who personally dealt with customers and former employees who did not rests on an unsound premise.

There is no legitimate reason for characterizing differently the conduct of a former employee who uses customer information personally developed for the employer during the period of employment from the use of the very same information developed by a coworker who had no customer contact. Creating an artificial distinction between the conduct of these two employees under the rubric of commercial impracticality in not being able to "wipe clean" one former employee's memory constitutes an unjustified abandonment of legitimate regulation of competitive activity, and ignores the paramount interest in protecting information meeting the definitional criteria of a trade secret.

Furthermore, in absolving former sales personnel from disclosing or using customer information that would otherwise qualify as a trade secret to solicit business, the court in *Moss, Adams* did not appropriately recognize that information developed by an employee concerning the employer's customers represents an investment of time and money *on the part of the employer*, justifying a grant of trade secret protection against exploitation by the former employee. " 'Trade and business secrets and confidential information are the property of the employer and cannot be used by the employee for his own benefit. A list of subscribers of a service, built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer, a part of the good will of his business and, in some instances, his entire business. Knowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice. [Citations.]' " (*American Loan Corp. v. California Commercial Corp.* (1963) 211 Cal.App.2d 515, 522-523 [27 Cal.Rptr. 243].) In the case of a former employee who attempts to use personal customer contacts for personal benefit upon going into competition with the former employer, "[i]t is this personal acquaintance and additional influence of the friendship developed during his employment . . . which makes solicitation of former customers by appellant *so unfair to his former employer.* [Citations.]" (*Peerless Oakland Laundry Co. v. Hickman* (1962) 205 Cal.App.2d 556, 560 [23 Cal.Rptr. 105], italics added.)

But one need not accept our view, or that of the *Sacks* court, in order to conclude *Moss, Adams* is inapplicable to the circumstances of this case. It is readily distinguishable for a much more elementary, and perhaps less controversial, reason. *Moss, Adam* was decided before the UTSA became effective. That court was unencumbered by the legislatively mandated definition of misappropriation now contained in the UTSA. ▮ Under the UTSA, simple disclosure or use may suffice to create liability. It is no longer necessary, if it ever was, to prove that the purpose to which the acquired information is put is outweighed by the interests of the trade secret holder or that use of a trade secret cannot be prohibited if it is infeasible to do so. Thus, despite the apparent solace appellants may find from the reasoning in *Moss, Adams*, its premise is inapposite to commercial interactions occurring after the effective date of the UTSA.[7]

▮ Appellants argue that solicitation could only be established by direct evidence on a customer-by-customer basis, and respondent failed to present evidence that direct solicitations occurred as to all affected Morlife customers. Such an assertion is unfounded in either law or logic. We have earlier catalogued the evidence adduced at trial as to the scope and character of contacts with Morlife customers, and the factual findings of the court distilled from the evidence. It was reasonable for the court to infer from the testimony of some of Morlife's former customers and from the other evidence before the court that appellants engaged in a general pattern of solicitation. Therefore, the court's finding that appellants used Morlife's customer list in soliciting customers for Burlingame is fully supported by the evidence.[8]

## RELIEF

▮ Burlingame asserts that the injunction issued by the trial court was overbroad and unjustified. As part of the relief granted Morlife, the court permanently enjoined appellants from doing business with any of the 32 entities who switched their business from Morlife to Burlingame after being unlawfully solicited. The court also enjoined appellants from "*soliciting* any business from *any* entity that did business with Morlife before Perry and Bowersmith stopped working there, provided they obtained knowledge about

[7]While *Moss, Adams* was decided by this district in March 1986, after the commencement date of the UTSA, the events which gave rise to the litigation, including the trial court proceedings, predated that law. (*American Credit Indemnity Co.* v *Sacks, supra,* 213 Cal.App.3d at p. 636, fn. 7.)

[8]In light of the trial court's finding that the acts of appellants constituted solicitations, we need not decide whether the "professional announcement" exception recognized in both *Moss, Adams* and *Sacks* has continued vitality in light of the expansive definition of misappropriation under the UTSA.

the customer during the course of their employment at Morlife." (Original italics.)

The restrictions imposed by the court in granting injunctive relief do not appear to be broader than authorized by the governing statute and appear to be in complete conformance with similar restrictions courts have enforced in the past. (*Vacco Industries, Inc.* v. *Van Den Berg, supra,* 5 Cal.App.4th at p. 53 [misappropriation of trade secrets warranted trial court enjoining defendants from further use and enjoyment of plaintiffs' trade secrets]; *Peerless Oakland Laundry Co.* v. *Hickman, supra,* 205 Cal.App.2d at pp. 560-561 [court may appropriately limit injunction to customers of whom defendant obtained knowledge while employed by plaintiff].)

The injunction does not cover potential customers with whom appellants had no contact and as to whom they acquired no information while at Morlife. The misappropriation of Morlife's trade secrets justifies application of the injunction to any Morlife customer about which appellants acquired information while they were in Morlife's employment. In view of the clearly established violation of the UTSA, the injunction correctly draws the line, and leaves Burlingame free to solicit customers whose identities are not the trade secrets of Morlife.

With regard to duration of the injunctive relief, the UTSA provides that the injunction may be continued even after the trade secret has been lawfully disclosed "in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." (§ 3426.2, subd. (a).) The duration of the injunction is not necessarily forever. The court specifically notes in its statement of decision that termination of the injunction may be sought pursuant to section 3426.2, subdivision (a).

■ We similarly reject Burlingame's challenge to the court's monetary award of $39,293.47, the amount appellants were allegedly enriched as a result of their trade secret violation. Evidence of appellants' unjust enrichment was presented in the form of their salaries earned during Burlingame's first six months of operation. The court applied a 33 percent figure to appellants' combined earnings, reflecting that 33 percent of Burlingame's business during the first six months was derived from commercial repair work for former Morlife customers. In its written findings, the court characterized the award of $39,293.47 as "a reasonable approximation" of the enrichment realized by appellants as a result of their misappropriation of Morlife's confidential customer information. We cannot say the court's determination was arbitrary or not supported by substantial evidence.

Appellants claim the correct measure of damages under section 3426.3 should have been to determine a reasonable royalty.[9] However, appellants failed to present any evidence that would allow the trial court to determine what royalty, if any, would be reasonable under the circumstances. As such, they cannot be heard to complain. (See *Unilogic, Inc.* v. *Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628 [12 Cal.Rptr.2d 741].)

Moreover, the imposition of a reasonable royalty is reserved for those instances where the court finds that neither actual damages to the holder of the trade secret nor unjust enrichment to the user is provable. (§ 3426.3, subd. (b).) Given the court's affirmative findings on the issue of unjust enrichment, which we confirm, the alternate remedy of imposing a royalty has no applicability.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., concurred.

**HAERLE, J.,** Concurring.—I find this an extremely troubling case. With great reluctance, I concur in the majority's opinion, but on the ground—and only on the ground—that the trial court's key finding of fact that respondent's "customer list" was a trade secret is supported by substantial evidence. But I think the margin by which it is so supported is about an inch and a half. Put another way, were I the trial judge looking at this record, I would almost certainly have come out differently than the trial judge here did. But our role is to defer to the trier of fact where there is substantial evidence, so defer I do—albeit with great trepidation.

The genesis for about 50 percent of that trepidation is because I take very seriously that part of the holding of our Supreme Court in *Continental Car-Na-Var Corp.* v. *Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9] (*Moseley*), which stresses that a "former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer" provided, of course, that such is done

---

[9]Section 3426.3 provides several measures of damages upon proof of misappropriation of trade secrets: "(a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss. [¶] (b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited. . . ."

fairly and legally. I am concerned that perhaps the trial court's statement of decision derives in part from the unstated premise that the shoe is, as it were, on the other foot and that there is a quasi-presumption that an employee can't leave his or her employment and go into competition with the former employer for the business of those customers. I hope this is not now and never will be the law.

The other 50 percent of my trepidation derives from the record in this case, a record that I submit far more supports the appellants' position than that of respondent. In the first place, it deserves to be stressed that appellants were never accused of taking any part of the "customer information . . . stored on [a] computer with restricted access" to which the majority refers. (Maj. opn., *ante*, at p. 1523.) Mr. Perry took only a collection of business cards with peoples' names and phone numbers on them, plus obviously his memory. It bears noting that lots of former sales employees have done similar things and not been held to have violated Civil Code section 3426.1. (See, e.g., *American Paper & Packaging Products, Inc.* v. *Kirgan* (1986) 183 Cal.App.3d 1318, 1326 [228 Cal.Rptr. 713]; *Scott* v. *Snelling and Snelling, Inc.* (N.D.Cal. 1990) 732 F.Supp. 1034, 1044-1045.)

I think it is also noteworthy that, of the four former Morlife customers who testified, only three (at the maximum; appellants argue it is only two) testified they were solicited by appellants. From this sparse record, the trial court "inferred" that all 32 customers on a list prepared and introduced into evidence by the respondent were illegally solicited by appellants. This is a distressingly small sample from which to make such a large inferential leap. But far more troubling is that from this "base" of three solicited customers, the injunction precludes solicitation of not only the thirty-two on respondent's list but also "any individual or entity that did business with [respondent] before [appellants] stopped working there, and of which they acquired knowledge in the course of their employment with [respondent]."

Thus, based on the testimony of three former Morlife customers (the fourth clearly testified she approached appellants), the trial court decided to enjoin appellants from soliciting *any* Morlife customer "of which they acquired knowledge in the course of their employment" with respondent. This extreme breadth, and its narrow evidentiary basis, carries the concepts of inferences to be logically drawn from the evidence and the discretion of a court of equity almost to the breaking point.

I think the record supplies more than ample evidence that (a) even without Burlingame, Morlife had competition in its roofing contracting business and (b) that competition, plus Burlingame, knew full well who likely customers

were. I understand that the trial court found that to the contrary, i.e., that such identity "is not generally known to the roofing industry" and I reluctantly concede that evidence sufficient to meet our liberal "substantial evidence" standard exists in support of that conclusion. But I am still troubled by it, not only because I think the bulk of the evidence points the other way, but also because I think the conclusion is belied by the combination of common sense and no more than an elemental understanding about how such areas of the private sector actually work.

I have one final concern about the decree appealed from here: its length. The trial court used the term "indefinitely" in its statement of decision and "permanently" in its injunction. It included in the former a pregnant footnote (fn. 2) to the effect that "[t]ermination of the injunction may be sought, of course, pursuant to Civil Code section 3426.2(a)." I hope it is, because the law under the operative sections is that "[i]njunctive relief should only last as long as is necessary to preserve the rights of parties," i.e., "only as long as is necessary to eliminate the commercial advantage that a person would obtain through misappropriation." (*American Paper & Packaging Products, Inc.* v. *Kirgan, supra,* 183 Cal.App.3d at p. 1326.) This injunction was entered over a year ago, and I trust the trial court will consider, as and when such an application is made to it, whether the time span suggested in *Moseley* may well have already run.