Filed 5/17/16  McCormack Auction Co. v. Hanks CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MCCORMACK AUCTION COMPANY, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JASON HANKS, <br><br> Defendant and Appellant. | D067814 <br><br><br> (Super. Ct. No. 37-2012-00070308-CU-BC-EC ) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Reversed.

Law Office of David B. Sharp and David B. Sharp for Defendant and Appellant.

Gordon & Rees, William M. Rathbone and Timothy K. Branson for Plaintiff and Respondent.

McCormack Auction Company, Inc. (McCormack) sued its former employee,

Jason Hanks, for violation of the Uniform Trade Secrets Act (Civ. Code,[1] § 3426, et seq.; UTSA), breach of contract, accounting, and for a constructive trust.  The case proceeded

---

[1]    Statutory references are to the Civil Code unless otherwise specified.

to a bench trial. The court found in favor of McCormack and determined that Hanks misappropriated McCormack's trade secrets and breached his employment contract. However, the court determined that damages could not be calculated under section 3426.3 so it awarded McCormick reasonable royalties of $2,000 a month for 21 months. The court entered judgment awarding McCormick $42,000 for the royalties and $5,350.54 in costs.

Hanks appeals the judgment, contending (1) substantial evidence does not support the trial court's finding that McCormack possessed trade secrets; (2) substantial evidence does not support the trial court's finding that Hanks misappropriated any of McCormack's trade secrets; (3) portions of Hanks's employment contract are unenforceable as a matter of law; and (4) the court's award of royalties instead of damages was improper and not supported by substantial evidence.

We agree with Hanks that substantial evidence does not support the trial court's conclusion that McCormack possessed any trade secrets, and even if a trade secret existed, there was not substantial evidence that Hanks misappropriated it. As the trial court found that Hanks breached his employment contract by misappropriating trade secrets, we also determine that substantial evidence does not support the finding that Hanks breached his contract. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The Complaint

McCormack brought suit against Hanks. In the operative complaint, McCormack alleged causes of action for violation of the UTSA, breach of contract, accounting, and

2

constructive trust.  Hanks answered the complaint, and the matter proceeded to a bench trial after the parties engaged in discovery.

Evidence at Trial

McCormack was a family owned auction company operating in San Diego County.  Over its 30 plus years of operating as an auction house, McCormack developed auction methods, techniques, and procedures to handle both in person and online auctions on a large scale basis.  In regard to the initial stages of the auction process, McCormack used contracts for auctions, consignment forms, and formulation for pricing, commissions, and submission of proposals for clients.  After McCormack entered into a contract with a client (seller), McCormack would engage in:  (1) marketing plans and procedures; and (2) set up, staging, grouping, cataloging, photographing, and pricing guidelines and procedures.  In addition, McCormack had systems and procedures for an auction preview by the public prior to an auction and procedures to inventory and develop pricing for each item to be auctioned.  McCormack had assembled a list of subcontractors and independent contractors it used to help run live auctions.  It also created procedures to collect funds from an auction, provide receipts to buyers, provide for collection of merchandise purchased at auction, and give clients detailed summaries of information regarding what was sold.  McCormack used similar procedures for online auctions as well.  McCormack maintained years of historical records in file cabinets. These records included long standing customers' contracts and pricing information.

McCormack also kept records of potential buyers of auction items to whom McCormack would direct market particular items.[2]

While McCormack remained an active auction house, it had some long term clients, including bankruptcy trustees, the City of La Mesa, the Grossmont-Cuyamaca College District, San Diego Community College District, the Helix Water District, and the Otay Water District.

Around 1992, Joshua McCormack (Joshua) joined his parents, and began working at McCormack full time. He was 18 years old. At one point, he owned 90 percent of the stock in McCormack. Joshua testified that he believed McCormack maintained confidential information. He described this confidential information as "[c]lient lists, customer lists, pricing schedules, procedures, [and] contacts of specific clients."[3] Joshua stated that the "confidential information" was kept in an electronic database on McCormack's computers with "older stuff" being kept "on hard copy." McCormack did not reveal any of the contact information to the public. However, McCormack advertised its clients on its website. And Joshua admitted that the names, mailing addresses, e-mail addresses, and phone numbers for the bankruptcy trustees were available online, and as

---

[2] The testimony regarding McCormack's procedures was general in nature. There was no explanation offered as to how McCormack's procedures differed from what other auction companies use.

[3] Clients were entities that would use McCormack's services to sell items at an auction. Customers consisted of potential buyers.

such, that information was in the "public domain."[4]  He also agreed that it is well known in the auction industry that bankruptcy trustees use auction companies.

In 2005, Hanks began to provide McCormack assistance with its network and computer systems.  Hanks had gone to high school with Joshua, and they had become close friends after they became reacquainted in late 2000.  By February 2007, Hanks worked part time for McCormack, including helping with auctions.  About six months later, he started working full time for McCormack.  Prior to working at McCormack, Hanks had no experience in the auction business.

In 2009, Hanks and McCormack entered into a "Contract Work Agreement" (Contract).  Among other terms, the Contract included a section addressing McCormack's confidential information.  That section prohibited Hanks from disclosing McCormack's confidential information, which was defined as "confidential technical and commercial information, including but not limited to the contents of all reports, specifications, quotations, formulae, computer records, client lists, price schedules, customer lists, customers and the like."  In addition, Hanks was required to "deliver to" McCormack certain information, documents, and records upon his separation from McCormack.  Hanks downloaded the Contract after Joshua told him to prepare a contract that would show that Hanks was McCormack's "contract employee and not a . . . W-2 employee."

Sometime in 2009, Hanks began to have direct contact with McCormack's clients.  As such, Hanks had access to the clients' contact information, including cell phone

---

4    One of McCormack's expert witnesses confirmed that the bankruptcy trustees' contact information is in the public domain.

numbers and e-mail addresses. As McCormack's primary IT person, Hanks also had access to McCormack's client lists and customer or buyer list, consisting of about 13,000 people in McCormack's database.

While he worked at McCormack, Hanks had several conversations with Joshua about becoming an owner of the company. Hanks invested $10,000 in McCormack, purchasing one percent of McCormack's stock. Although there were negotiations for further investment by Hanks, including obtaining a third party to prepare a valuation of McCormack, Hanks and Joshua never reached any other agreement. Ultimately, Hanks left McCormack on October 31, 2011.

When Hanks left, he asked for his computer minus the hard drive to be returned to him, but McCormack kept it. Hanks did keep his personal laptop that he had used occasionally for live auctions. While Hanks was working at McCormack, he could use his laptop to gain remote access to the information on McCormack's server. However, after Hanks left McCormack, he assumed he did not have remote access to McCormack's server because he believed the network access passwords had been changed. McCormack also paid Hanks back the $10,000 he had previously invested. Hanks did not leave with any documents relating to McCormack.

Hanks and Joshua also argued about whether Hanks could keep the cell phone number he had while working at McCormack. The number was on McCormack's account for approximately two years. Joshua did not want Hanks to keep the cell number because McCormack owned it, clients contacted McCormack through that number, and it was a source of business to McCormack. Initially, Hanks and Joshua agreed that

6

McCormack would keep the cell phone number. However, Hanks changed his mind and asked to keep it. In the end, Joshua agreed to allow Hanks to keep the cell number because Hanks told him that he would not change over the web hosting and domain name for McCormack from his name to McCormack's unless he was able to keep the number. Joshua stated that the company was "crippled" if it did not have control of its website so he felt that he had to allow Hanks to keep the number.[5]

Hanks "probably had a few [McCormack] clients[']" contact information in his cell phone. These clients were certain bankruptcy trustees as well as Doug Emory of Helix Water District. Although Joshua and Hanks argued over whether Hanks could keep the cell phone number, there was no dispute about the cell phone, which belonged to Hanks. Also, there was no evidence presented that Joshua asked Hanks to delete any of McCormack's client information contained on Hanks's cell phone.

After he left McCormack, Hanks talked with Fisher Auction about employment and worked there for one or two auctions. Hanks had the skills to do online auctions and wanted to consult with other auctioneers about transforming from live auctions to on-line auctions because that is what he had done for the past four years.

---

[5]     The evidence on this issue was very muddled at trial. Hanks testified that McCormack was listed as the "owner, technical . . . contact, administrative contact and billing contact" for the McCormack domain. Nevertheless, for purposes of renewal, the domain was under Hanks's personal GoDaddy account. Hanks admitted that he told Joshua he would not change the "web hosting" from his name to McCormack's unless Joshua gave him the cell phone number. Hanks stated that although he would not do the work, somebody at McCormack "easily" could have transferred it without his help. McCormack's trial counsel did not explore this issue further.

In November 2011, Hanks began doing business as Cal Auctions. In May 2012, Hanks formed Cal Auctions, LLC and is the sole member/owner of it. To market Cal Auctions, Hanks used LinkedIn, Facebook, and yellow pages on-line. Hanks used the internet to find potential clients and contact information. Hanks also advertised on Craigslist and paid Google for search priority. Additionally, Hanks advertised Cal Auctions in the Union-Tribune.

Hanks admitted to soliciting some of McCormack's clients, including Leslie Gladstone (a bankruptcy trustee), San Diego Community College, and Helix Water District (through Doug Emory). Hanks also contacted Gary Waldorf of San Diego Community College District when he solicited its work. Hanks solicited other McCormack clients via mailers.

Hanks also solicited work from CBRE. To this end, he contacted Elizabeth Burke, whom he met while working for McCormack. However, Hanks also contacted other individuals at CBRE in his efforts to solicit work as well. He obtained these additional contacts by searching for the information on the LinkedIn website. Burke was listed on that website as well.

Hanks contacted a client and customer of McCormack, Ken Steele, to see if he wanted to buy guns that Cal Auction was auctioning. Hanks "Googled" Steele to obtain his phone number. Hanks also called Joe Castle, a previous buyer at McCormack's auctions, but he was not sure how he obtained Castle's number.

Hanks performed his first auction in February 2012 for an uncle of a friend.

In June 2012, Hanks's first e-mail "blast" via a bulk e-mail provider for an auction had only 423 subscribers. He joined a consortium of about 10 auctioneers (Asset Bridge) to increase the number of customers, and by doing so, Hanks had access to over 50,000 buyers.

Hanks testified that he did not take any of McCormack's client lists or customer lists when he left the company. When asked if he used the same processes at Cal Auction as he used at McCormack, he responded:

> "There are some processes that, you know, [are] general auctioneering processes that we use, but we really do things a lot different now. Part of joining up with the Asset Bridge was really learning a new way to do things, everything from the way we market to the way we ID and photo items and describe items, and it -- it's a lot different now. We don't use any of the same programs that I used to use."

In June 2012, Cal Auctions performed its first auction for a client of McCormack. Since then, Cal Auctions has performed additional auctions from sellers that used McCormack in the past.

Joshua testified that McCormack had lost three main clients to Cal Auctions: Helix Water District, San Diego Community College District, and Leslie Gladstone (a bankruptcy trustee). McCormack sold its assets on August 31, 2013 for $500,000.

Because we conclude that substantial evidence does not support the court's finding that Hanks misappropriated any of McCormack's trade secrets, we do not discuss the evidence at trial pertaining to damages.

9

## The Trial Court's Decision

After the conclusion of trial, the trial court sent a letter to the parties indicating that it found in favor of McCormack on its causes of action for violation of the UTSA and breach of contract. The court further found that it was "not easy to establish the truth or validity of damages" so it awarded McCormack 21 months of reasonable royalty payments of $2,000 per month.

In response to the court's letter, Hanks requested a statement of decision. In doing so, Hanks asked the court to address 21 issues, including identifying McCormack's specific trade secrets.

The court subsequently filed a statement of decision wherein the court found that McCormack "owned trade secrets that included not only the identity of [McCormack's] client contact persons and information, but also the method, technique and process of running a large-scale operation auction." The court also found the identity of McCormack's clients and their "general contact information" were not trade secrets. However, the court ruled that the identity of the specific contact person and his or her contact information for McCormack's clients "as well as the method of negotiation and sale were" McCormack's trade secrets. The court stated that Hanks misappropriated McCormack's trade secrets: He "opened up his own auction company and directly competed with [McCormack], using [McCormack's] auction contacts and methods, quotes, specifications, and computer records."

In addition, the court found that Hanks breached his contract with McCormack by misappropriating McCormack's trade secrets.

10

The statement of decision included the award of royalty payments to McCormack in a total amount of $42,000.

Hanks objected to the statement of decision. The court did not modify the statement of decision and entered judgment in favor of McCormack against Hanks.[6]

Hanks timely appealed.

DISCUSSION

The UTSA prohibits misappropriation of trade secrets. (§§ 3426.2, 3426.3.) For purposes of the act, "trade secret" is defined as information that "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).) The focus of the first part of the statutory definition is on whether the information is generally known to or readily ascertainable by business competitors or others to whom the information would have some economic value. (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 251.) Information that is readily ascertainable by a business competitor derives no independent value from not being generally known. (*American Paper & Packaging Products, Inc. v. Kirgan* (1986) 183 Cal.App.3d 1318, 1326.)

---

6    McCormack named both Hanks and Cal Auctions as defendants in the operative complaint. The judgment was only against Hanks. Cal Auctions is not a party to this appeal.

11

"Misappropriation" is defined to include "use of a trade secret of another without express or implied consent by a person who: [¶] . . . [¶] [a]t the time of . . . use, knew or had reason to know that his or her knowledge of the trade secret was: [¶] . . . [¶] [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." (§ 3426.1, subd. (b).)

Here, the court found that McCormack possessed the following trade secrets: "the identity of [McCormack's] client's [sic] contact persons and information" as well as "the method, technique, and process of running a large-scale operation auction." Additionally, the court indicated that it determined that McCormack's "method of negotiation and sale" was a trade secret. The court also found that Hanks misappropriated these trade secrets. Hanks challenges these findings.

We must accept the trial court's finding of the existence of a trade secret unless the record reveals no substantial evidence to support it. (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521 (*Morlife*).) We apply the same deferential standard of review in evaluating Hanks's challenge to the court's conclusion that he misappropriated a trade secret. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 42.)

Here, we address the situation where a former employee starts a company that directly competes with the former employer. "While it has been legally recognized that a former employee may use general knowledge, skill, and experience acquired in his or her former employment in competition with a former employer, the former employee may not use confidential information or trade secrets in doing so." (*Morlife*, *supra*, 56

12

Cal.App.4th at p. 1519.)  In other words, Hanks could start a company that directly competed with McCormack; however, he could not use McCormack's trade secrets to do so.  For purposes of our analysis here, we divide McCormack's purported trade secrets into two categories.  The first includes trade secrets relating to the running of the business.  These were the trade secrets the trial court described as "the method, technique, and process of running a large-scale operation auction" as well as McCormack's "method of negotiation and sale."  For convenience, we refer to this batch of trade secrets as "McCormack's procedures."  The second category is limited to the specific client contact identity and information.

In considering the trial court's determination of McCormack's procedures as trade secrets, we agree that trade secrets may consist of formulas, methods, techniques and processes.  (§ 3426.1, subd. (d); *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 49-50.)  Thus, ostensibly the items within the first category of trade secrets appear to be possibly worthy of legal protection unless they are simply general methods of doing business.  (See *Fortna v. Martin* (1958) 158 Cal.App.2d 634, 639-640.) The problem in the record before us is that it is difficult to ascertain how McCormack's procedures could be deemed trade secrets.

In his opening brief, Hanks emphasizes that Joshua, who testified on behalf of McCormack, discussed McCormack's business practices in generic terms.  Hanks further argues that based on Joshua's description of McCormack's business in general terms, it is difficult to discern how McCormack's business practices differed from other auction houses' business practices.  We agree.  Indeed, McCormack's respondent's brief does little

13

to alleviate our concerns on this issue. It merely cites to portions of Joshua's testimony describing McCormack's business in broad terms. It does not provide us with examples where McCormack established at trial the differences in its procedures from those of other auction houses. In reviewing the segments of the record cited by McCormick, we struggle to find where Joshua provided testimony that would establish McCormack's "method, technique, and process of running a large-scale operation auction" and its "method of negotiation and sale" were different from what other auction companies used. For example, during Joshua's direct testimony, the following exchange occurred:

"Q.     Are you aware of any public information or classes that would explain how to do the steps you just mentioned?

"A.     Not in the fashion we do them or not with the subcontractors that we use or the pricing that we use.

"Q.      Okay.

"A.      Not with the exact contracts that we use.

"Q.     You talked about subcontractors. What subcontractors are you referring to?

"A.     There's a lot of services that can be involved, anything from record storage to locksmiths. I think I mentioned portable restrooms, towing of vehicles, moving, advertising, car detailers. There's quite a few subcontractors that we work with. Our security company, or labor company.

"Q.     Okay. And does McCormack Auction Company, have they had relationships with those types of people over the years?

"A.     Some of those people go back three generations to my grandfather as far as the towing industry, locksmiths. I've been using the same auto detailer over 20 years. The

14

portable restrooms, the advertising, yeah, most of it goes back a long ways.

"Q. Okay. Do you have certain pricing with each of those subcontractors?

"A. I do. We've been with them for so long that as their prices have increased, a lot of ours remained 20 years old.

"Q. And do you have to use those prices when you give prices to clients?

"A. I don't know that we have to, but we don't mark up the prices. It is part of the service that we provide is passing along our special pricing or discounts to our clients?"

Later during his testimony, Joshua claimed that he believed McCormack maintained, as confidential, "[c]lient lists, customer lists, pricing schedules, procedures, contracts with specific clients." Joshua explained why he believed the client lists, customer lists, and pricing as to clients was confidential, but he did not explain what made McCormack's procedures unique.

We have little doubt that McCormack, over the past 30 plus years, developed some distinctive procedures that may be appropriately classified as trade secrets. However, based on the record before us, we are at a loss as to what those procedures might be. Even in reviewing the evidence in the light most favorable to the judgment, we strain to find substantial evidence supporting the conclusion that McCormack's "method, technique, and process of running a large-scale operation auction" and its "method of negotiation and sale" are exclusive as to McCormack. Put differently, we do not find support for the conclusion that these procedures derived some independent economic value from not being generally known to the public or other people who could obtain

15

economic value from its disclosure or use. (§ 3426.1, subd. (d); *Morlife*, *supra*, 56 Cal.App.4th at p. 1520.)

Our difficulty in concluding that substantial evidence supports the court's determination that McCormack's procedures were a trade secret is underscored by the lack of evidence that Hanks used McCormack's procedures in establishing and running Cal Auctions. The trial court determined that Hanks used McCormack's "auction contacts and methods, quotes, specifications, and computer records" to compete directly with McCormack. Hanks points out that there is no evidence to support the court's conclusion. In response, McCormack does not cite to any evidence supporting the court's finding of misappropriation of its procedures. Instead, McCormack emphasizes that Hanks had no auction experience prior to working at McCormack and there was no publicly available information or education Hanks could have used to learn McCormack's procedures. Even taking these contentions as supported by the evidence, what remains lacking is any evidence regarding what trade secrets from McCormack Hanks actually used to set up and operate Cal Auctions.

For example, there is no evidence that Hanks took any of McCormack's computer programs when he left his employment there. Nor is there any evidence that Hanks had access to or did access McCormack's network after he terminated his employment. At most, there is testimony that Hanks used a "generalized auctioneering process[]" that could have been used by McCormack, but Hanks stressed that he "do[es] things a lot different" than what was done at McCormack. He testified that joining Asset Bridge allowed him to discover new ways to operate his business. After Hanks testified about

16

the process he used, McCormack's trial attorney had the opportunity to cross-examine him about that issue, but he did not do so. Therefore, the record does not offer any evidence, let alone substantial evidence, that supports the trial court's conclusion Hanks misappropriated a trade secret consisting of McCormack's procedures.

Although not cited by either party here, our review of the record found evidence that, at least for some period of time, McCormack and Cal Auctions used the same computer software called "Auction Flex." However, Auction Flex is not software developed by McCormack, but instead, can be purchased "off the shelf" and apparently is available for purchase by the public. As such, it cannot be classified as a trade secret. (See § 3426.1, subd. (d).)

In short, we conclude that substantial evidence does not support the trial court's conclusion that any of McCormack's procedures were trade secrets, and even if they were, there is no evidence that Hanks misappropriated them.

We next address the court's finding that McCormack's clients' specific contact information (i.e., the identity and cell number or e-mail address of a specific employee of the client) was a trade secret. Both parties concede that a company's client list can be a trade secret. (See *Wanke, Industrial, Commercial, Residential, Inc. v. Keck* (2012) 209 Cal.App.4th 1151, 1174-1175; *Morlife*, *supra*, 56 Cal.App.4th at pp. 1522-1523.) However, here, the trial court did not find that McCormack's client list was a trade secret: "In this case, the identity of [McCormack's] clients . . . were not protected trade secrets . . . . Nor were these clients' general contact information . . . ." Such a finding logically follows the undisputed testimony that McCormack listed its clients on its

17

website, and as such, their respective identities were in the public domain. However, the court determined that "the identity of contact persons [of McCormack's clients] and their information" was a trade secret. Thus, the instant matter presents the novel issue whether the identity of a particular client contact person can be deemed a trade secret if the identity of the client and the client's general contact information is in the public domain.

Neither party provided any authority addressing this precise issue. However, McCormack contends the instant matter is analogous to *Morlife*, *supra*, 56 Cal.App.4th 1514 and urges us to follow that case to affirm the trial court's finding that the identities of particular contacts and their information are trade secrets.

In *Morlife*, *supra*, 56 Cal.App.4th 1514, the defendant employees of a roofing company, Morlife, resigned and joined a competitor. Upon leaving Morlife, one of the defendant employees took business cards of Morlife's clients that he had collected during his employment with Morlife and the defendant employees used those cards to help them solicit Morlife's clients. (*Id.* at p. 1524.) After trial, the trial court found that Morlife provided a " 'relatively unusual roofing service, namely commercial roof repair and maintenance, as distinguished from replacement roofing.' " (*Id.* at p. 1521.) The trial court also determined that Morlife's customer list was " 'a compilation, developed over a period of years, of names, addresses, and contact persons, containing pricing information and knowledge about particular roofs and roofing needs of customers using its services.' " (*Ibid.*) The trial court noted " '[t]he identity of those particular commercial buildings using such services [was] not generally known to the roofing industry.' " (*Ibid.*) The trial court further found " 'Morlife made reasonable efforts to maintain the secrecy of its

18

customers' identity by limiting circulation of its customer lists.' " (*Ibid*.) The appellate court noted that courts generally are reluctant to protect customer information as trade secrets, but found that the trial court's finding was supported by substantial evidence in the record. (*Id*. at pp. 1521-1523.)

The instant matter is distinguishable from *Morlife* in that here there is no confidential customer list. In *Morlife*, the trial court heard testimony that the identities of Morlife's customers were not readily ascertainable, but only discoverable with great effort. (*Morlife*, *supra*, 56 Cal.App.4th at p. 1522.) Here, to the contrary, it is undisputed that McCormack listed its clients on its website. Thus, anyone could easily acquire the identities of McCormack's clients and would not have to expend much effort or resources to do so.

McCormack somewhat ignores this distinction, and instead, focuses on specific contacts for its clients. Therefore, it appears that McCormack is comparing the identity and contact information for specific contact people here with the customer list in *Morlife, supra,* 56 Cal.App.4th 1514. We do not find this to be an apt comparison.

In *Morlife*, *supra*, 56 Cal.App.4th 1514, evidence was presented that Morlife obtained its customers through "the expenditure of considerable time and money." (*Id*. at p. 1522.) Indeed, Morlife established that it "developed its customer base by investment in telemarketing, sales visits, mailings, advertising, membership in trade associations, referrals and research. Out of 100 persons contacted by the telemarketing department, only about 10 result[ed] in contacts." (*Ibid.*) Further, Morlife's president "estimated an initial visit by a Morlife salesperson cost[] the company $238." (*Ibid*.) In other words, at

19

trial, Morlife presented specific evidence, including an estimated cost, regarding the resources it invested to create its client list.

Here, McCormack has not cited to any analogous evidence in the record. Instead, it has pointed us to Joshua's testimony that McCormack built relationships with certain individuals over the past 30 years. Noticeably lacking is any evidence regarding the resources McCormack expended in finding these individuals.

In *Morlife*, the Court of Appeal observed that courts have been hesitant to protect customer lists as trade secrets:

> "[C]ourts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. [Citation.] On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers. [Citations.] As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." (*Morlife*, *supra*, 56 Cal.App.4th at pp. 1521-1522.)

*Morlife's* cautionary language is applicable here. For example, McCormack identifies certain bankruptcy trustees as individual contacts whose identities and contact information the trial court deemed trade secrets. However, the undisputed evidence is that the identities and contact information of these bankruptcy trustees was publicly available on the internet. Thus, these contacts could not be trade secrets as a matter of law because they are generally known and McCormack could not take reasonable steps to keep the information secret. (See § 3426.1, subd. (d).)

20

In addition, other contacts that the trial court deemed a trade secret were shown to be publicly available. For example, Hanks testified that, after he left McCormack, he contacted Elizabeth Burke at CBRE, whom he had met while working at McCormack. However, Hanks testified that he contacted others at CBRE and obtained their contact information from LinkedIn. Burke was listed on the LinkedIn page as well. Thus, Burke's contact information was in the public domain and could not be correctly classified as a trade secret.

McCormack attempts to minimize these shortcomings in the evidence and argues that the trial court needed to only make "the ultimate finding that McCormack owned trade secrets in the form of the client contact names and information." Yet, such a conclusion still must be supported by substantial evidence. (See *Vacco Industries, Inc. v. Van Den Berg*, *supra,* 5 Cal.App.4th at p. 50.) And McCormack has not pointed us to substantial evidence that supports the trial court's ultimate conclusion. There is no indication that McCormack spent considerable time and money to discover the identity of these client contacts or their information. McCormack does not identify evidence showing that the identity of its contacts and their information provided it with a substantial business advantage over its competitors. At most, McCormack has evidence that it spent several years cultivating relationships with certain contacts. Although this evidence would be sufficient to support the implication that McCormack developed solid, longstanding relationships with certain contacts that allowed it to better serve particular clients, the evidence falls short of establishing a trade secret, especially when McCormack broadcasts the identity of its clients on its website.

21

In addition, we observe that the evidence shows Hanks signed the Contract whereby he agreed not to disclose McCormack's confidential information. However, this contract is not the talisman that transforms the identities of certain contacts and their information into trade secrets. (See *American Paper & Packaging Products, Inc. v. Kirgan*, *supra,* 183 Cal.App.3d at pp. 1325-1326.) Although the Contract can be one factor for us to consider, other indicia of a trade secret must be present as well. Here there is none.

Further underscoring the absence of substantial evidence on this point, we observe that the record is replete with evidence illustrating why the client contacts cannot be considered trade secrets. McCormack announced its client list on its website. There is no evidence regarding the effort involved (including time and money spent) in McCormack discovering the identities and contact information of the various client contacts. Many of the client contacts' information was publicly available. Although Hanks had certain contact information on his personal cell phone, there is no indication in the record that McCormack requested that he delete that information when he terminated his employment.[7]

In summary, under the specific facts of this case, we determine that substantial evidence does not support the trial court's determination that the identities of

---

[7] We note the existence of this evidence in the record not in an effort to weigh it against evidence supporting the trial court's conclusion that the identities of the client contacts were trade secrets. We do not weigh evidence under a substantial evidence review. (See *Leff v. Gunter* (1983) 33 Cal.3d 508, 518.) As we indicate above, substantial evidence supporting the trial court's conclusion that the identities and contact information of the client contacts were trade secrets does not exist in the record.

22

McCormack's clients' contact persons as well as their contact information are trade secrets.

Because we conclude substantial evidence does not support McCormack's claim that Hanks misappropriated McCormack's trade secrets, it logically follows that we determine that Hanks did not breach the Contract. The trial court found Hanks breached the Contract by misappropriating trade secrets. As substantial evidence does not support that finding, there is no other evidence that Hanks breached the Contract.

Having concluded that Hanks did not misappropriate any trade secret or breach the Contract, we need not address Hanks's challenge to the court's determination of damages. Nor do we reach the other issues Hanks raises in this appeal.

## DISPOSITION

The judgment is reversed. Hanks is awarded his costs on appeal.

_____

HUFFMAN, J.

WE CONCUR:

_____

McCONNELL, P. J.

_____

O'ROURKE, J.

23